LIVINGSTON AND GILCHRIST *v.* THE MARY-
LAND INSURANCE COMPANY.

*If the interest of one joint owner of a cargo be insured, and if that interest be neutral, it is no breach of the warranty of neutrality if the other joint owner, whose interest is not insured, be a belligerent.*

*The assured are not understood to warrant that the whole cargo is neutral, but that the interest insured is neutral.*

*The effect of a misrepresentation or concealment, upon a policy, depends upon its materiality to the risk, which must be decided by a jury under the direction of a court.*

*The right to abandon may be kept in suspense by mutual consent.*

*If foreign laws and regulations respecting trade be not proved to have been in writing as public edicts, they may be proved by parol.*

*If a vessel take*

ERROR to the circuit court for the district of Ma-
ryland, in an action of *covenant* upon a policy (of in-
surance against capture only) upon goods laden on
board the ship *Herkimer* from *Guyaquil*, or her last
port of discharge in South America, to New-York;
the goods were warranted to be *American* property,
"*proof of which to be required in the United States
only.*" The ship and cargo were captured by a British
ship of war, and condemned at Halifax as prize.

The defence set up by the underwriters was,

1. That one *Baruro*, a Spanish subject, was interest-
ed in the cargo, and that Baruro being a subject of
one of the belligerents, the warranty of neutrality was
forfeited.

2. That certain Spanish papers were found on board
stating the cargo to be the property of Baruro, and al-
though Baruro might not be interested in the cargo,
yet these papers, not being necessary, according to the
usual course of the trade, were the cause of the con-
demnation, and as this cause proceeded from the act
of the insured, the underwriters were not liable.

3. That although the *interest* of the plaintiffs Living-
ston & Gilchrist, was neutral, yet the concealment of
the interest of *Baruro* vitiated the policy.

4. That the abandonment was not made in due time.

To these objections the plaintiffs answered,

1. That *Baruro* was not part owner of the goods;
he had only a contingent interest in the profits of the
voyage. That the subject insured was only the *inte-*

*rest of the plaintiffs*, which was strictly neutral property.

2. That the Spanish papers were necessary to carry on the voyage insured, according to the nature and course of the trade.

3. That the interest of Baruro was not such as they were bound to disclose.

Upon the trial of the issue of *non infregit conventionem*, the jury found a special verdict; and a bill of exceptions was taken by the plaintiffs in error to the instruction of the court to the jury, that parol evidence was not competent to prove, "that according to the uniform and long standing laws of Spain, relative to the trade of her colonies in America, and especially of Peru, no goods could, at and about the time of the making the policy in the declaration mentioned, be imported into, or exported from, the colony of Peru, from, or to any other than a Spanish port in Europe, or in any other than a Spanish bottom, without a special license from the King of Spain for that purpose, and that such licenses, at and about the said time, were never granted, with respect to the said colony of Peru, to any but Spanish subjects; and that, according to the constant course and usage of the trade, to and from that colony, under such licenses, it was usual and necessary for the property to appear, in the said colony, and at its departure therefrom, as the property of a Spanish subject, and of the person holding the license, to be accompanied by such Spanish papers as were necessary to give it that appearance, and to be cleared out as such from the port of. departure in Peru; such licenses, not being avowedly transferable; although by observing the abovementioned formalities and precautions, American property, at and about the said time, might be, and sometimes was, imported into, and exported from, the said colony by American citizens, by virtue, and under the protection, of such licenses."

The order for insurance, which was supposed to

LIVINGSTON
v.
MAR. IN. Co.

on board papers which increase the risk of capture, and if it be not the regular usage of the trade insured to take such papers, the non-disclosure of the fact that they would be on board will vacate the policy;

LIVINGSTON
v.
MAR. IN. Co.

amount to a representation, that the whole cargo was neutral property, was contained in a letter from the plaintiff Gilchrist to Webster & Co. at Baltimore, in which he says, "on the recommendation of Messrs. Church & Demmill, I take the liberty of requesting you to effect insurance in your city on the cargo of the ship Herkimer, Church, master, from Guyaquil, or her last port of departure in South America, to New-York, against loss by capture only, warranted American property, and free from all loss on account of seizure, for illicit or prohibited trade. The owners are already insured against the dangers of the seas, and all other risks except that of capture. You will please to insure to the amount of fifty thousand dollars in valued policies. You have already had a description of the ship from Messrs. Church & Demmill, the agents of Mr. Jackson, who is the owner, and which I presume is correct. By a letter received from Mr. James Baxter, the supercargo, dated at Lima, the 23d of September, 1805, he did not expect the Herkimer would sail from Guyaquil until the last of February. I think proper to mention, that the insurance will be on account of Mr. Brockholst Livingston and myself. Mr. Baxter and Mr. Griswold are also concerned, but the first gentleman thinks there is so little danger of capture, that in his letter from Lima, he expressly directs no insurance to be made for him against this risk, and Mr. Griswold is not here to consult. Both these gentlemen, as well as those for whom you are desired to make insurance are native Americans."

The description of the ship, as given by Church & Demmill, and referred to in the above letter, was as follows: "She is a fine ship of about 400 tons burden, about three years old, sheathed and coppered to the bends, built in the state of New-York, and her owner a native American citizen. She sailed from Boston on the 12th day of May last, bound for Lima, with liberty to go to one other port in South America, not west of Guyaquil and from thence to New-York.

"She has permission to trade there."

On the 5th of June, 1806, the plaintiff Gilchrist, LIVINGSTON
wrote to Webster & Co. at Baltimore, informing them MAR. IN. Co.
of the capture of the vessel, and that the plaintiffs had
sent an agent to Halifax to act in behalf of the con-
cerned, and desiring that this information should be
communicated to the underwriters, and assurances
that the plaintiffs should act throughout with due re-
gard to their respective interests. He then says, " I
should like them to approbate the owners in taking
every measure they may judge best for our mutual
interest, *without prejudice to our right.* I ought like-
wise to mention that one of the owners has also gone
in her, so the underwriters will observe every measure
calculated to protect their and our interest has been
speedily pursued." This letter was laid before the
underwriters, who returned it with their answer endor-
sed thereon " *read and approved.*"

On the 22d of August, 1806, after the condemna-
tion in the court of vice-admiralty, the plaintiffs aban-
doned to the underwriters.

The cause was argued at great length by *Harper*,
for the plaintiffs in error, and by *Winder, Key* and *Mar-
tin*, for the defendants, but their arguments were prin-
cipally upon points not decided by the court.

### March 16.

MARSHALL, Ch. J. delivered the opinion of the
court as follows:

In this case several questions have occurred, on
which the court has not yet formed an opinion. The
application of rules and principles, which have been
framed for an action on the case, to an action of cove-
nant, is an operation of some difficulty. The court
has not decided with precision, on the extent of the
plea, that the defendant has not broken his covenant,
nor on the testimony which may be admitted under
that plea. Some difficulty, also, arises from the cir-
cumstances, that the parties have gone to trial under
the expectation that the whole merits of the case were

LIVINGSTON
v.
MAR. IN. Co.

open, under the issue which was joined, and that such expectation was authorized by the invariable usage of the courts of Maryland, and of the circuit court sitting in that state.

Upon the inspection of the special verdict in this case, it is supposed that, however these points may be decided, a *venire facias de novo*, would probably be awarded; and, as the delay of a term would be a great inconvenience to the parties, it is deemed advisable to award it now.

There are, however, some points, which have been argued at great length, on which an opinion has been formed, which will now be delivered.

It is essential, in this form of action especially, to distinguish accurately between the warranty contained in the policy, and those extrinsic circumstances, such as misrepresentation or concealment, which have been deemed sufficient to discharge the underwriters. Although the effect of a breach of a warranty, and of a material misrepresentation may be the same on a policy, yet they cannot be confounded together, in deciding on pleadings or on a special verdict.

The warranty, in this case, is in these words; "warranted, by the assured, to be American property, proof of which to be required in the United States only."

The interest insured is admitted to be American property, in the strictest sense of the term; but it is contended, that Baruro, a Spanish subject, had an interest in the cargo, which falsifies the warranty.

Whether Baruro could be considered as having an interest in the cargo, or not, is a question of some intricacy, which the court has not decided; and which, if determined in the one way or the other, would not affect the warranty; because, the assured are not understood to warrant that the whole cargo is neutral, but that the interest insured is neutral.

If the assured represented the whole cargo to be neutral, when it was not, or if they concealed the interest of a belligerent, when it ought to have been disclosed, which facts this court neither affirm nor deny, the effect of the misrepresentation or concealment on the policy, depends on its materiality to the risk. This must be decided by a jury under the direction of a court. In this case, it has not been decided. Consequently, were it even to be admitted that, under the peculiar circumstances of this case, these facts might be taken into consideration, without being specially pleaded, a *venire facias de novo* would be necessary, in order to ascertain their materiality.

So, too, with respect to the Spanish papers found on board.

It is said that the verdict finds their materiality, by finding that the fair premium on American property disguised as Spanish, on the voyage insured, was twenty-five *per cent.* whereas the premium, in this case, was only ten *per cent.*

But, it does not appear to the court that this property was, by these papers, disguised as Spanish. It is found to have been the constant course of the trade to have them on board, and, consequently, they cannot be understood to disguise the property as Spanish, when there are other papers which prove it to be American.

It is, too, as yet, undecided, that this matter could be given in evidence, on this issue.

Although this verdict, and these pleadings, do not present the merits of the cause in such form as to enable the court to decide them, there are some insulated points, from which the cause may be relieved.

The reference to the letter of Church and Demmill, which was made by the assured, in their letter of the 26th of March, to Alexander Webster & Co., has

LIVINGSTON been treated both as a representation, and as a warran-
v.
MAR. IN. Co. ty, which is falsified by the sentence of condemnation.

There is no colour for this opinion.

Most clearly it is not a warranty, for it is not intro-
duced into the policy; and if it were a representation,
it only goes to the actual state of the ship, at the time,
not to her future conduct.

But it is not even a representation. Marshall, 336.
is full and clear on this point.

The letter of the assured, of the 5th of June, is
understood to ask the permission of the underwriters
to keep their right to abandon in a state of suspense,
and the note made by the president and directors, on
that letter, is understood as granting that permission.
It is difficult to ascribe this letter to any other motive.

It has been asked, for how long a time is this per-
mission given? The answer is obvious. It is, at
least, to continue while the property continued in its
then situation, unless it should be sooner determined
by one of the parties. The assured might abandon
previous to the sentence, or immediately afterwards;
and the underwriters might, at any time, require the
assured to elect immediately, either to abandon or to
waive the right so to do. Since they have not made
this communication, their original permission continued
in force. But the jury have not found that the aban-
donment was or was not in due time.

It is, also, the opinion of the court that, as the laws
and regulation , by which this trade was regulated, are
not proved to have been in writing, as public edicts,
but may have depended on instructions to the governor,
'they may be proved by parol.

The judgment is to be reversed, because the spe-
cial verdict is defective; and the cause remanded, with
directions to award a *venire facias de novo.*

In the second case, it is ordered to be certified, that, if the jury should be of opinion that the Spanish papers, mentioned in this case, were material to the risk, and that it was not the regular usage of the trade insured to take such papers on board, the non-disclosure of the fact that they would be on board, would vitiate the policy; but if the jury should be of opinion that they were not material to the risk, or that it was the regular usage of the trade to take such papers on board, that they would not vitiate the policy.