### DRAKE *vs.* HUDSON & FRANCISCUS.—June, 1826.

D & F, owners of the schooner *Superior*, sent her to *Havana*, consigned to P, where she arrived on the 3d March 1816. P, having discharged his duties as consignee, on the 17th of April, paid the then customary duties at the custom house at *Havana*; and he made up his accounts accordingly, and transmitted them to D & F, on the vessel's return. It appeared by parol evidence, that the *intendant* of *Havana*, by an order stated to be *dated* the 1st of March 1816, but not made public till some time after, directed that vessels entering that port, after the said 1st of March, should pay an additional duty, and that the consignees there had been compelled to pay this duty; and that among them P, as the consignee of the *Superior*, was called on to pay it in the November following, when it was paid by P's house. In an action of *assumpsit* by P,

against D & F, to recover the amount so paid—*Held,* that he was individually entitled to recover, although the payment was made by his house. That a consignment transfers not only the power, but is a request to the consignee to pay all charges to which the vessel may be liable, at her port of delivery, and for such charges the consignee, if he acts in that character, becomes personally liable.

*Held* also, that though it was clear from the evidence, that the order of the *intendant* at *Havana,* under which the additional duty was paid, was in writing, still its contents might be proved by parol, and that it was not necessary to prove it by an authentic or sworn copy—the rule which requires this last proof, being applicable only to such foreign laws, or public edicts, of which a regular record is necessarily presumed to have been kept.

*Held* also, that although the contents of the order could not legally be proved by parol, yet that payments under the order might be so proved; as such payments established the fact of the amount of duties payable at *Havana,* and the usage or custom to pay them; and a usage or custom may be proved by parol, whether it originates in a public written law, or not.

APPEAL from *Baltimore* County Court. *Assumpsit* for money paid, laid out and expended; money lent and advanced, and on an *insimul computassent.* The defendants, (the appellees,) pleaded *non assumpsit,* and issue was joined. At the trial the plaintiff, (the appellant,) offered evidence, that the defendants, together with a certain *Carston Newhouse,* who was then alive, but not alive at the institution of this suit, were owners of a vessel called the *Schooner Superior;* that in the early part of the year 1816, the said vessel was sent with a cargo by the said owners to the *Havana,* consigned to the plaintiff; and that in the latter part of the month of March 1816, it was a matter of general notoriety at *Havana,* that the consignees of all vessels which had come into the port subsequently to the 1st of March 1816, were required by a municipal regulation, or order of the intendant of that port, to pay double tonnage-duty on all vessels which had so arrived after said 1st day of March; that is to say, an additional duty of five and a half rials per ton, over and above the regular duty of the same amount, which had been before the usual and accustomed duty. That this additional duty had actually been paid in several instances by the witness, who was offered to prove the general notoriety of the existence of the duty, to the consignees, with whom he settled his accounts, and under whose

eare were the vessels, of which he was supercargo. The plaintiff further read in evidence the commission which issued out of *Baltimore* county court on the 28th of February 1822, to certain persons of the city of *Havana*, in the Island of *Cuba*, for the purpose of taking testimony, with the interrogatories and depositions returned with the commission, viz. The deposition of *Jose Manuel de Lorio*, merchant in the city of *Havana*, who deposed, in answer to the second and third questions, that "he recollects that the *American* schooner *Superior*, (the vessel named above,) captain *Barry*, arrived here in the port of *Havana* on the 3d of March 1816; that the house of *James Drake* (the plaintiff,) paid the tonnage-duty on said schooner at the rate of five and a half rials per ton, making, on 289 tons, $198 and five and half rials. These duties were paid at the custom-house on the 17th of April of said year. Answer to the fourth question—He knows of an order of the intendant of this city, *dated* 1st of March 1816, but not communicated to the public at that time, in virtue of which all vessels that had come into this port subsequent to the 1st of March 1816, must pay double-tonnage duty; that is to say, eleven rials per ton, instead of five and a half rials. He knows that all the consignees of vessels, entered subsequent to the 1st of March 1816, were obliged to pay the arrear; and in consequence, *James Drake* was called upon to pay, and did pay at the custom-house, on the 14th of November 1816, the additional duty of five and a half rials per ton on the said schooner *Superior*, making the sum of $198, five and a half rials. He also knows that this sum is still due to *James Drake* by the owners of the said schooner." The deposition of *John B. Fronty*, clerk in the house of Messrs. *Drake* & *Mitchell* in the city of *Havana*, deposed, in answer to the second question, that "he recollects that a certain tonnage-duty was paid by the house of *James Drake*, on account of the *American* schooner *Superior*, which arrived in this port on the 3d of March 1816, amounting to $198, and five and a half rials. This duty was paid on the 17th of April 1816, at the custom-house, at the rate of five and a half rials per ton, the schooner measuring, as per register, 298 tons. Answer to the third and fourth questions.—He knows that the house of *James Drake* was called upon to pay

an additional tonnage-duty for said vessel of 5½ rials per ton, in virtue of a new order of the intendant, not made known at the time the first payment was made; and that although the vessel's accounts were closed and sent, the house had to pay on the 14th o. November 1816, $198 and five and a half rials, at the custom-house for this additional duty.   That the order of the intendant comprehended all foreign vessels which had entered this port subsequent to the 1st of March 1816.   He knows that this last payment remains still due to the house of *James Drake*, by the owners of the said schooner." Upon this evidence the defendants prayed the court to direct the jury, that inasmuch as the above deposition of *Jose Manuel de Lorio* states, that the "order of the intendant" of *Havana*, which imposed the additional duty, "was *dated* the 1st of March 1816," the jury were bound to infer that the said order was in writing, as originally issued by the intendant, and that, consequently, no parol evidence could be admitted to prove the existence of such an order, or the payment by the plaintiff, for the use of the defendants, of any duty imposed by such order; and that the jury must, therefore, find their verdict for the defendants.   This direction the Court, [*Archer*, Ch. J. and *Hanson*, A. J.] gave to the jury.   The plaintiff excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued before BUCHANAN, Ch. J. and EARLE, MARTIN, STEPHEN, and DORSEY, J.

*R. B. Magruder*, and *Krebs*, for the Appellant, contended, 1. That whether the order of the Intendant of *Havana*, men tioned in the bill of exceptions, was *in writing* or not, was a question *of fact* for the jury; and that, therefore, the *absolute* direction of the court was erroneous.   2. That admitting the jury were bound to infer that the order was in writing, still parol evidence was admissible, under the circumstances of the case, to prove its existence, and, therefore, the absolute direction was erroneous.   3. That even if the order was in writing, still as it was not proved to have been in writing as a *public edict*, but may have been the result of instructions from the governor of *Cuba*, it might have been proved by parol.   4. That whether

the order was a public edict in writing, or not, the appellant might legally offer parol evidence of any *payments* he might have been obliged to make for the use of the appellees, on account of any *duty* imposed by such order, or which by any usage of trade, or regulation at *Havana*, the appellant, as consignee, was compelled to make.

On the *first* point, they cited *Wilson vs. Dickson*, 2 *Barn. & Alder.* 10. *Marine Insurance Company of Alexandria vs. Young*, 5 *Cranch*, 187. *Jackson vs. Schoonmaker*, 2 *Johns. Rep.* 234.

On the *second* point—*Church vs. Hubbart*, 2 *Cranch*, 226, 237.

On the *third* point—*Church vs. Hubbart*, 2 *Cranch*, 226. *Livingston vs. Maryland Insurance Company*, 6 *Cranch*, 274.

On the *fourth* point—*Livingston vs. Maryland Insurance Company*, 7 *Cranch*, 512. *Smith vs. Elder*, 3 *Johns. Rep.* 105. *Grant vs. M'Lachlin*, 4 *Johns. Rep.* 34. *Van Omeron vs. Dowick*, 2 *Campb.* 42.

*Frick*, for the Appellees. The appellant contends, that having paid money for the appellees under a compulsory order of the Intendant of the *Havana*, which order is said, by one of the witnesses, to be *dated the 1st of March*, it does not necessarily follow that the said order was in writing, and therefore the court below should have submitted the question to the jury. This position confounds the admissibility of evidence with the effect. The latter is for the jury, the former for the court. If there was any room to doubt the nature of this order, the absolute direction of the court was erroneous. But the court say that this order, from the very terms used, was a written order, and whether they erred or not in so saying, is the inquiry? And they contend also, that admitting the order to have been in writing, yet parol proof of its contents was admissible, unless at least it was proved to be in writing, as a *public edict*. This is contrary to the elementary principle of evidence, that requires the best the nature of the case admits; for no evidence can be given which, in its nature, supposes still greater evidence behind in the party's power. 1 *Phill. Evid.* 167. Here an order is

shown general in its nature, being a maritime or revenue or-
dinance, and this order is proved to be written.    How then
does the case in *Livingston vs. Maryland Insurance Compa-
ny*, 6 *Cranch*, 274, apply?  If they be not proved to be writ-
ten, then parol proof may be adduced.    It denotes the distinc-
tion between the written and unwritten law of a foreign country,
and it is only the latter which may be proved by parol.    *Kenny
vs. Van Horne*, 1 *Johns. Rep.* 394.    *Hulle vs. Heightman*,
4 *Esp.* 79.    *Condy's Marsh.* 706, *(note.)    Miller vs. Hein-
rick*, 4 *Campb.* 155.    But this is said not to be an edict.   What
then is it?  See the word in *Johnson*; it is there said to be "a
law promulgated in writing," &c.    And Ch. J. *Marshall* treats
all foreign laws as edicts.    *Church vs. Hubbart*, 2 *Cranch*, 187.
As to the  giving parol evidence of the payment of money un-
der such an order admitted  to be in writing, which is not pro-
duced, no legal apology offered for the nonproduction, no op-
portunity afforded to the appellee to test the legality, the pro-
priety, or the *vis major* of such order, not even its *genuineness*,
no authority has or can be produced to support such a position.
If the money was paid under a usage of trade, as is assumed in
the appellant's *fourth* point, then the position has some weight.
But the term order, forbids the notion or idea of a usage in this
case—"The true test of a  commercial usage, is its having  ex-
isted long enough to have become generally known, and to war-
rant a presumption that contracts were made in reference to it."
*Renner vs. Bank of Columbia*, 9 *Wheaton*, 591.   That it was
*a regulation* at *Havana* is admitted; and indeed one of the
witnesses speaks of it as such.    But foreign commercial regu-
lations cannot be proved by parol.    *Condy's Marshall*, 706,
*(note a,)* and the reference.    Besides, the relation of shipper and
consignee had ceased between the parties—the vessel's accounts
had been closed and sent when this payment was made.    From
a voluntary payment for a third person no  assumpsit can arise.
But, says the appellant, it was a compulsory payment.    And
how?    Under the order of the intendant?    And here the *first*
point again recurs—Was this order in writing or not?    See *John-
son's Dict.*    The meaning of DATE, is—1. The time when a let-
ter is written, &c.  2.  The time when any event has happened;
and TO DATE, is to *note* the time when any thing is written or

done. Therefore, any thing *dated*, hath the time *noted* when it was written or done. How noted? Thus: *quo tempore scriptum est.* For this see *Ainsworth*, under the word *date.* To make it plain, he asks—What *date* doth it bear? And renders it in Latin; *quo tempore scriptum est.* Then in the same lexicon refer to the Latin *datus*, and it is said to mean given, granted, DATED *as a letter;* and for illustration quotes *Cicero* & *Plautus*, *datum pridie.* The surest guide is etymology, where the import of words hath not been abused or perverted by modern convenience; as is not the case in this instance. See *Minshew's* Lexicon, (A. D. 1625,) which contains also the exposition of the terms of the *English* law: "a *date" of writing,* (as if it could be coupled with nothing else,) or *edition of a* writ—*a lat.* DATUM; i. e. given out, *quia datur* SCRIPTO *autoritas, et* DIES *mensis et anni datur, ac etiam* SCRIPTUM *hominum* MANIBUS, *datur et traditur*, &c. &c. See the same, supported by analogous reference to other languages ancient & modern, *loc. cit.* Here the word has a technical meaning, "the edition of a writ," (it is not doubted that means a writing,) and that induces the further inquiry, whether before or since the days of *Minshew*, lawyers have ever referred to any thing dated, that did not necessarily assume it a writing. *Vide* the case of *Pugh vs. Duke of Leeds, Cowper*, 434. The question there hath no reference to this; but the words are in point, and furnish the illustration desired. The matter concerned a lease, and the difference between a *datu* & a *die datus*, i. e. of the lease. Why not *"from the leasing* or *the day of the leasing?* Because it was written, and was dated. Suppose it a verbal lease, is it not a pleonasm to say" the day of the date "of the lease." It is a pleonasm if the subject matter be *not* written, since, if it means only the time when done, *"the day"* is enough. In law a will may be verbal, so a lease, an agreement, &c. may be verbal; and we speak of the *day* when the will, the lease, &c. was made. But if we speak of a will, of a lease, &c. that was or is *dated,* what lawyer ever resisted the conclusion that it was first written? *Blackstone* says, "lastly comes the conclusion, (of a deed) which mentions the *date* of the deed, or the time of its being given or executed." This is the uniform application, the most general and reputable use of the word; and if any divided

use can be established, yet the canons of criticism fortify the positions taken. Consult the analogy and etymology of the language, and if neither perspicuity nor analogy support it, (which it is maintained they do,) the meaning, most conformable to ancient usage, must be taken and preferred. *Campbell's Philo. Rhetoric.* If the latter then have any weight, and the interesting Diversions of *Purley* may be adduced as authority, see the II vol. p. 22. "A *date*, is merely the participle *datum*, which was written by the *Romans* at the bottom of their epistles." Yet, say that standing alone the word is equivocal, the rule then is that it must depend upon the context or subject matter. It is an order that is dated; now, an order in itself may be either verbal or written, and when standing by itself it is always supposed to be verbal; and if verbal, is said to be issued, or given, &c. as by an order of the governor, issued on the 1st of March. But couple this order, command, edict, or whatever it might be termed, with a date, (say that it is dated,) and can a philologist withhold the inference that it is written. But go to the *whole* subject matter. How could it have been a *verbal* order of the 1st of March, if *not known on that day*, but *afterwards* promulgated? For the witness says, the order was not *known* till after the 17th of April. Here is an order to pay additional duties, not customary—in its nature a general order, not applicable to the customs alone at *Havana*, but to all the ports of the island. Would the governor be most likely to resort to a circular, or would he send a verbal messenger around the whole island? When was such a preposterous thing ever done in like case?

*Mitchell*, on the same side, cited *D'Arcy vs. Lyle*, 5 *Binny's Rep.* 441, cited in 2 *Liv. on Agency*, 23, to prove that a consignee is not a general but a special agent; and that if an agent pay an illegal or exorbitant demand, it cannot be recovered. The agency of the plaintiff had terminated, and he could not recover in this form of action. It is proved that the money was not advanced by the plaintiff, but by the firm of *Drake* and *Mitchell.* The suit, therefore, should have been in their names. To show that foreign laws are presumed to be promulgated in the same manner as our own laws are, he cited

*Banoorgee vs. Hovey,* 5 *Mass. Rep.* 41. *Church vs. Hub-bart,* 2 *Cranch,* 226, *(Martin's* Argument.*)* 1 *Phill. Evid.* 301, *(notes.) Smith vs. Elder,* 3 *Johns. Rep.* 113. *Exall. vs. Partride,* 8 *T. R.* 310; and *Spurrier vs. Elderton,* 5 *Esp. Rep.* 2.

*R. B. Magruder,* in reply.

DORSEY, J. delivered the opinion of the Court. The appellees, the owners of the schooner *Superior,* despatched her, with a cargo, to the *Havana,* where she arrived on the third day of March 1816, consigned to the appellant, who having discharged his duties as consignee, on the 17th of April paid at the custom-house a duty of five and a half rials per ton, (the amount always payable, anterior to the first of March 1816,) made up his accounts accordingly; which, on the return of the schooner, were transmitted to the consignors at *Baltimore.* It is in proof, by competent witnesses, that by an order of the intendant of *Havana* dated said first day of March, but not made public until sometime after, all vessels entering that port were required to pay a duty of eleven rials per ton, instead of the amount heretofore demandable. That the consignees of all vessels, which arrived after the said first day of March, had been obliged to pay the said increased impost on tonnage, and that supercargoes settled with them accordingly. That in November 1816, the appellant was called on, and had to pay the additional duty, amounting to the sum of $198 and five and a half rials. For the recovery of which sum the present action was instituted.

This claim is objected to on two grounds: *First.* That the appellant paid this money as a mere volunteer, and cannot become the creditor of the appellees without their consent. This objection is entitled to no consideration. The very act of consignment, transfers not only the power, but is in fact a request to the consignee to pay all charges to which the vessel may be necessarily subjected at her port of delivery. For the payment thereof, the consignee pledges his personal responsibility; to him, and not to the consignors, is the credit given at the custom-house.

The *second* objection is, that "no parol evidence can be offered of the order of the first of March 1816, or of any payment made under the same;" and of this opinion were the court below, and so instructed the jury.

That this order was in writing, we think most manifest from the proof in the cause; but that it is of such a character, that its contents can only be proved by an authentic or sworn copy, we cannot admit. This strictness, in proving the laws of a foreign country, is only applicable to laws or public edicts, of which a regular record is necessarily presumed to have been kept. The order of the first of March is not of this description—It is a mere instruction or rule prescribed by the intendant of *Havana*, for regulating the duty of the custom-house officers, and may not be any where recorded. That orders or instructions of this kind, given in a foreign country, may be proved by parol, *vide Livingston & Gilchrist, vs. The Maryland Insurance Company*, 6 *Cranch*, 280, and 1 *Phill. Ev.* 301, *(note* a.) But even admit, that the order spoken of in this case were to be considered as a law or public edict, the contents of which it is inadmissible to prove by parol, yet it appears to this court, that the testimony offered by the plaintiff, (that under an order of the intendant of *Havana* the custom-house officers did always demand and receive this double tonnage duty upon all foreign vessels arriving after the first of March 1816,) was admissible before the jury, without any other proof of the order itself. It establishes the fact, or call it if you please an usage or custom, as to the amount of duties payable there; which usage or custom may be proved by parol, whether arising under a public written law or not. See the case of *Livingston and Gilchrist vs. The Maryland Insurance Company*, 7 *Cranch*, 539 and 1 *Phil. Ev.* 301, *(note* a.) The great inconvenience and injustice, which might flow from the sanction of a different principle, is most obvious. We therefore dissent from the opinion given by the court below, and reverse their judgment.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.