The opinion of the court was delivered by
Duncan, J.
This is a brief outline of the cause of action. The plaintiff, a widow lady resident in New Orleans, possessed of considerable real and personal estate, interrnarriéd in 1791 with George Dougherty, the testator,—a man then in rather indigent circumstances. He cohabited with her a few months, and in September, 1791, obtained from her seven thousand dollars, for which he gave her the following instrument of writing:—
“ Je soussigné, en presence de témoins, reeonnois avoir regu de ma femme la somme de sept mille piastres qu’elle me confie pour aller faire une pacotille á Philadelphie, et révenir de suite, ayant charge la dite somme1 de sept mille piastres á bord du Balaou Espagnol, le Saint Joseph, Captain Bordos, sur lequel •Balaou je suis passager. Je luí donne la présente reeonnoissance comme étant sa propriete, afinqu’elle puisse reclamer la elite somme de sept mille piastres du capitaine ou de mes parents á Philadelphie, en cas que je viendros á mourir, á Dieu ne plaise. 'A la Nouvelle Orleans, Ie 26 Septembre, 1791.

Jn. Dupuy. George Dougherty.

F. Paequetet.

*86 Translation.
“I, the underwritten, in the rupsenoe of witnesses, acknowledge to have received of mv wife, Hit sum of seven thousand dollars, which she intrusts me to go and purchase un ad «-enture at Philadelphia, and return immediately, having shipped the said sum of seven thousand dollars on board the Spanish Schooner St. Joseph, Captain- Bordos, in which schooner I am a pn-.s- nger. I give her'the present acknowledgment, as-being her property, in order that she may claim the said sum of seven thousand debars of the captain, or my relations at Philadelphia, in case 1 should happen to die, which God forbid. New Orleans, 2fit.h September, 1791. George Dougherty.
■ Jn. Dupuy.

F. Paquelet.”

He, immediately after this, sailed for the United States, and came- to Philadelphia, where he resided until his death, in 1820. He made a will, by which he bequeathed to his wife one third part of the rents and profits of his real estate, and the residue of his estate he gave to his sisters. Some time after, but within a year after his death, the plaintiff brought this action to recover the seven thousand dollars. It did not appear that after he left New Orleans, he had any communication or correspondence with his wife; for, in his will, he stales he does not know whether she is alive or dead. Taking into view the substance of the counts in the declaration, it was an assumpsit for money lent to the husband by the wife in the common form, and for money advanced to him to be paid on his death. The plaintiff claims the original sum, with interest from the commencement of the action. Besides the proof by the written document, the'plaintiff proved the advance of this money by the deposition of two witnesses. The defendant pleaded non-assumpsit, and non-assumpsit infra sex ■annos, and payment. To the plea of the statute of limitations, the plaintiff replied, that she was beyond sea, and a feme covert. Rejoinder, that she was not beypnd sea; that she was the wife of George Dougherty, at the time the .money was received, and continued such until his death. It was agreed that the defendant should have the full benefit of all objections to this plea of coverture, as if he had specially demurred. There was a plea of deficiency of assets. The plaintiff offered to prove by a witness, William Canonge, an advocate of Louisiana, stating his knowledge of the law of Louisiana, before and after its cession to the United States, in the year 1791, and generally when that colony was under the dominion of the king of Spain, and who is likewise conversant in the laws which have been enacted under the territorial and state government, that by such writing the wife might legally contract with the husband for such property as she held in her paraphernal right; and that all her property was paraphernal, except that which *87 was settled by marriage contract, which was dotal. That by those laws, she could lend it or let him have the use of it. That there was nothing in the Spanish laws in any way to invalidate such contracts, but, on the contrary, they were valid, and that as well by the old Spanish laws as by the laws now in force, the wife had at the time of the dissolution of the marriage an action against the husband or his heirs, for the restitution of all the property which she hrought in marriage, either dotal or paraphernal, and which the husband may have had the use of, and that to that effect the law raises and gives to the wife, or her heirs, a mortgage on the property of her husband. This evidence was objected to, on the ground that it was to prove the laws of a foreign country by parol. No allegation was then made that, the law was founded on written edicts, or that it was other than the unwritten law of the country. I admitted the evidence, reserving the points, and the first matter to be decided is, whether this was competent evidence. Our courts are not bound to notice the laws of Spain. The way of proving foreign laws, is by admitting them to be proved as facts, and the court must assist the jury in ascertaining what the fact is. Mostyn v. Fabrigas, 1 Cowp. 145. The unwritten laws must be proved by the testimony of persons acquainted with them, by public history, or by eases decided. But an edict registered must be proved by a copy under the'national seal, or by a sworn copy collated by a witness; and in this, as well as in every other case of trial of fact, the best evidence which' the nature of the case will admit of must be produced; that is, the evidence in the power of the party producing it. This rule of evidence applies to foreign laws, as it does to the other facts. Church v. Hubbard, 2 Cranch, 236. Thus one may prove by parol a contract, but if it be shown to be in writing, the writing must be produced. 'When this evi-' dence was received, there was not a suggestion, much less any proof, that the law stated by Mr. Canonge was other than the unwritten law of the country. These laws are generally difficult of proof. It would be a very expensive matter to prove them by copies authenticated, it therefore shall reasonably’fall on the party objecting to the parol proof to show that the law was a written edict of the country. Reason and public convenience, the just administration of the law, require this. We need' not go abroad, and look for decisions in other countries, for it was decided in the highest court in our own country, in Livingston v. Maryland Insurance Company, 6 Cranch, 274, that if foreign laws are not proved to have been in writing public edicts, they may be proved by parol. There can be no difference whether it be a law regulating trade, or a law on any other subject:—the rule, from its nature, is universal. It is, therefore, the opinion of the court, that this evidence was properly admitted.
This disposes of the first and second reasons assigned, as causes for new a trial. But if the defendant now had shown a written law *88 of Spain, an edict different from the law as stated by Mr. Canonge’s deposition, which proved that the defendant had been injured, and that that had been received as the law which was not the law: this would have been good ground for granting a new trial. After this evidence had been received, Mr. Duponceau, counsel for the plaintiff, produced the Digest of the Civil Law of Louisiana, published by the legislature in 1808, not for the purpose of proving that the law, with respect to the rights of married women, was law of positive enactment, but to show, that it was the law before the cession of Louisiana to the United States; not that it was then first enacted. And the book clearly proved this; for that book does not purport to be original enactments, but a digest of the whole body of civil law; a codification, not new enactments. But a Spanish work is produced, which the defendant says does prove that it was the law,—the written law, or edicts. The book is called Recopilación de las Indies. It does contain chapters on espousals, and some incidents of marriage: but his counsel did not pretend another law, another edict on this subject variant from the law as stated from Mr. Canonge. In truth and in fact, the laws, as stated by that gentleman to have existed in New Orleans in 1791, and ever since, I take to be the Roman civil law: for the laws, as he stated it, was precisely as in the digest of 1808, and the Napoleon Code: so that it is nothing more than a compilation. In pages 385, 396, the law of Louisiana is given on this subject nearly in the words of Mr. Canonge, and the Napoleon Code. Mr. Griffiths states, in the third volume of his Register, 674, this digest of the civil law to be now in force in Louisiana; and, in the Appendix, (page 700,) that this digest was chiefly modelled on the civil law, in some respects raised by local usages and territorial acts, passed at the time of its compilation; by which laws New Orleans was regulated at the time of its cession. But there seems to be a difference of opinion. The late President Jeeeerson, in his pamphlet on the Batture, says, they' were' the laws of France, and when Spain obtained possession in 1769, the changes introduced were chiefly in organizing the government, but little in jurisprudence. In pages 23 and 24, he asserts, that the great system (page 21,) which- regulates property, the rights of persons or things, was the French law, and the Spanish law leaves the rights of the people untouched. This is denied by Mr. Livingston, in his answer to the pamphlet, who contends that the Recopilación, or Digest of the Laws of Castile and the Indies, is the system. Chancellor Kent, in his commentaries on the laws, page 421, observes that the great body of the Roman and civil law, as well in some of the European countries, as in the new states of Spanish America, in the province of Lower Canada, and jn one of the United States, (Louisiana,) is the basis of the unwritten common law. He refers to the civil code of Louisiana, as published in 1823. And that civil com *89 aion law is now taught and obeyed, not only in France, Germany, Holland, and Scotland, but in the islands of the Indian Ocean, and on the banks of .the Mississippi and St. Lawrence.” Page 482. in the Scotch eases on marriage, brought up by appeal before (he House of Lords, the depositions of the learned in the law were resorted to as evidence of the law of Scotland. In Pre. Ch. 208, an agreement in marriage between, two French people in France, touching the wife’s fortune, was ordered to be executed. It was the agreement it should go according to the custom of Paris, and evidence was given of that custom. This was a bill by the wife’s relations, many years after her death, to have the benefit of the contract, and it was so ordered. And in 1 P. Wms. 431, on a marriage contract in Holland, the same law was held, but ^a^ it must be proved what were the laws of Holland. There has been nothing produced on the argument of this matter, to show that any law, written or unwritten, prevailed in Louisiana at the time of this contract, different from, that stated by Air. Canonje. His deposition stands uneontradicted. It°is0f®»tified by the Digest of Louisiana of 1808, and by the Napoleon Code. There is therefore no reason to direct another trial on this ground.
The fourth reason assigned is, evidence discovered since the trial. It must be a case under very peculiar circumstances, that would warrant the court to grant a new trial for this cause. But here the new-discovered witness was the sister and legatee of. the testator: a person directly interested in the event of the cause, and all she attempts to prove is the death-bed declaration of the testator. This has not been urged on the court; indeed no argument could be raised on it.
The fifth is because the letter of the plaintiff to the.executor before payment made by him to the legatees, absolves him from all charge of devastavit. The payment to the legatees was not compulsory, but voluntary. It, was wiihin the year, and if the executor chose to pay it without taking a refunding bond with security, he -must blame himself. If he trusted the legatees, he should suffer, and not the creditors. Besides, it is no answer for the executor to say, I paid over to the legatees. It is a devastavit; unless indeed the creditors had acted deceptiously, or encouraged or connived at the payment. The correspondence shows nothing of this kind, and the suit was commenced with great celerity. All was done within the year.
The seventh cause is, that the plaintiff never having resided out of Louisiana since her marriage, and the husband never having resided in Louisiana since the year 1731, the plaintiff is barred by the act of limitations from having the right to bring the action, notwithstanding the coverture. This is connected with the third; which is, because the judge charged that no length of time whatsoever, unaccompanied with other circumstances, was sufficient to *90 raise a presumption of payment, or satisfaction of the debt. I stated tó the jury, that the time would not begin to run. during the coverture of the plaintiff, and the suit was brought six years after discoverture. That it was a case of positive enactment: the time of the statute, and nothing short of that, was a bar. That time had expired after discoverture. The jury would, if there were such circumstances as satisfied their consciences that the money was paid, find for the defendant. The circumstances would not have ■warranted a finding of payment. On the words of the instrument, the parties had a view to his death before his return from that voyage; his representatives-were to pay it to her. He never did return, and the event has happened on which it was to be paid to her. But, according to the evidence and the law, this money was recoverable by the wife or her heirs, on the dissolution, of the marriage, and an action would lie by such heirs for the restitution of the property, and there are counts in the declaration so stating the contract. But if the money were immediately payable, I do not think that the statute would bar. The argument is, that she might have filed a bill in chancery against herbusband, she being a citizen of another state in the Circuit Court of the United States. Two answers may be given to that: First, a wife cannot be a citizen of another state: her domicil is the domicil of her husband, her settlement is his. They are but one body; and though it may be that in a Court of Chancery a wife might file a bill against her husband, yet the bill would not lie in any court of the United States, because she never would be considered as a citizen of another state; and, as citizens of the same state, it is not quite clear that one could file a bill personally against the other. In the chancery cases, it will be found that she might file a bill for appropriating a fund in which the husband would necessarily be a party; but it is believed she could have no personal decree to recover money from him« But be this as it may, the case is expressly provided for by the fifth section of the act of limitations. ■ She falls within the very letter of that provision. “ If such person, at the time of the action accrued, be within the .age of' twenty-one years, a feme covert, &c. the same person shall be at liberty to bring the same action, so as they take the same within six years, as are hereby before limited, after they come of full age, discoverture, Sec.” It is not incapacity to sue that suspends, and preserves the right: for infants might sue, lunatics and persons beyond sea. It is, however, contended, that if this matter could be sustained at all, the wife might have brought it in the Pennsylvania courts of common law. It has not been denied, that if the testimony of Mr. Canonge was credited, the-contract was a valid one; and it is just to observe his deposition had been long taken. The defendant was apprised both of the. evidence and the law, and that it was to be proved by parol;, and, if there had been other or different laws, he had full opportunity to *91 disprove this testimony. Whatever may have been the flexible opinions in England, about the right of married people, it is there settled finally that the wife cannot sustain an action against the husband. The good old common law is restored. It was the common law of that country, at the time of the revolution, and is now the common law there, as it always has been here. In Marshall v. Rutter, 8 Term Rep. 545, it was settled by the opinion of all the judges, that a feme covert cannot contract-and he sued as a feme sole; though she be living apart from her husband, having a separate maintenance secured to her by deed. Lord Kenyon, who delivered the opinion of all the judges, says it was asked, whether after separation, the wife eould.be convicted of felony committed in the presence of her husband?—whether they could be witnesses for or against each other? and whether they could sue or take each other in execution? Many other questions will occur to every one, to which it will be impossible to give a satisfactory answer; for instance, it may be asked how it can be in the power of any persons, by their private agreements, to alter the character and condition which by law results from the state of marriage: and for them to confer rights of action and legal responsibilities by such alteration, or how any power short of the legislature can change that which by the common law of the land is established as the course of judicial precedent. The course is to have the intervention of trustees. The law was so laid down by this court, in 10 Reí’g. fy Rawle, 208. In case of abjuration, banishment, or transportation of the husband beyond sea, she may be sued or she may sue as a feme sole; because that amounts to a civil death. Even transportation for a term of years has been considered as a case of some difficulty, with respect to the enjoyment of the husband’s estate, both real and personal. This contract, as to its legal construction, must be governed by the laws of Louisiana, as they were when it was entered into, and when the marriage took place. The plaintiff has proved, that this was a valid-contract; but the mode of redress must be according to the laws of our forum. Our act of limitations governs as to time: it governs in the form of action; and in the consideration of the grade of debt, whether specialty or simple contract. It is a simple contract debt, barrable according to our'act of limitations, and the remedy is in this form of action. I say barrable,—but it is not barred.
The last objection remains to be considered: it is, that if it be the law, that the wife cannot sue the husband, she cannot sue her husband’s executors; but if this be a contract where the day of payment is postponed until the death of the husband, then the right of action is only suspended. There are numerous decisions to this purpose; and it would not follow, that jf it were payable immediately the debt was extinct; the remedy only is suspended, and one, among many other reasons for this is, that the husband and wife form but one body; but on his death, she being the sur *92 vivor, has all the right not extinguished by the marriage; and therefore her husband being dead, this can cause no strife between them. She may sue his executors. Like the settlement of a pauper, the right is suspended during his life, but revives on bis death: or privileged persons, the remedy against them is suspended until the privilege ceases. Aliens, during war, the right of action is suspended: on the return of peace, it revives. In the case of 1 Nay, 515, in which a feme sole takes a bond of a man she intends, to marry, to leave her one thousand pounds at his death, Lord Holt was of opinion that the debt was extinguished; but Tourton and Gould were of a different opinion. And Gould said that the bond was not extinct, but might subsist by the rule of law; for the law does not love'that rights should be destroyed; but, on the contrary, invents fictions to support them, such as abeyance; and the law never will work a release, since -there are two rules of law which would be broken by the destruction of the agreement: First, Modus et conventio vincunt legem. Secondly, That the law will not work a wrong; and a suspension of rights does not always work an extinguishment. He observed that the law does not work an absolute extinguishment. In the 26th Hen. 8th, it is held, if there be a divorce, the wife shall have her goods again; and Fitzherbert and Norwich put the case of a bond bv the husband before coverture, and said although there was a suspense during the coverture, yet after the divorce she might sue him upon it. It does not follow, because for certain reasons the right may be qualified) and recovery suspended during the coverture, yet when the reasons are removed by the death of the husband, she should have no remedy against the executors. The opinion of Tourton and Gould have prevailed over Lord-Holt’s; and modern judges have lamented that Lord Holt should, have had recourse to flimsy .and technical reasoning, so evidently against law and conscience. In fact, the controversy here is between the wife and the husband’s relations; for the plaintiff agreed, and the verdict is so taken, that all the husband’s debts, specialty and simple contracts, shall be paid, in the first place, but of the assets. It is an honest claim, and there is no legal impediment in the way of recovery. It is doing what the husband declared should be done, a restoration by his relations of the money held by him in trust for the wife. And I am not certain whether a Court of Chancery on marriage, in England would not decree the same thing to be done. In 3 P. Wms. 317, where a husband voluntarily and after marriage allowed his wife for her separate use to make profit of butter, poultry, &c.) out of which she'saved one hundred pounds, which the husband borrowed, and died, ordered that the wife should come in as a creditor, especially there being no defect of assets to pay debts. It was said by the Chancellor, the strongest proof of the husband’s consent that the wife should have a separate property in these savings, is that he had applied to her, and *93 prevailed on her to lend him this sum; in which case he did not lay claim to if as his own, but submitted to borrow it. as her money. As to the difference between Pennsylvania and Louisiana interest, the point was not made on the trial, nor was it worth making, for the plaintiff will not get the principal. It is, however, agreed to be taken according to the interest of Louisiana. That being done, the rule is discharged.
Rule discharged.