## WILBURN BOAT CO. ET AL. *v.* FIREMAN'S FUND INSURANCE CO.

No. 7. Argued October 14–15, 1954.—Decided February 28, 1955.

*Theodore G. Schirmeyer* and *Mark Martin* argued the cause for petitioners. On the brief were *Mr. Schirmeyer, Hobert Price* and *Alexander Gullett.*

*Edward B. Hayes* argued the cause and filed a brief for respondent.

*Leonard J. Matteson* and *Ezra G. Benedict Fox* filed a brief for the American Institute of Marine Underwriters, as *amicus curiae,* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

This case raises questions concerning the power of States to regulate the terms and conditions of marine insurance contracts.

Glenn, Frank and Henry Wilburn, merchants in Denison, Texas, bought a small houseboat to use for commercial carriage of passengers on nearby Lake Texoma, an artificial inland lake between Texas and Oklahoma. The respondent Fireman's Fund Insurance Company insured the boat against loss from fire and other perils. While moored on the lake the boat was destroyed by fire. Following respondent's refusal to pay for the loss, this suit was brought in a Texas state court by the Wilburns and by their wholly owned corporation, the Wilburn Boat Company, to which the boat's legal title had been transferred. After removal of the case to the United States District Court because of diversity, respondent answered admitting issuance of the policy, payment of premiums and destruction of the boat. Liability was denied however because of alleged breaches of printed policy terms or "warranties" providing that, without written consent of the company, the boat could not be sold, transferred, assigned, pledged, hired or chartered, and must be used solely for private pleasure purposes.[1] The case was submitted on stipulated facts supplemented by oral testimony. Contending that the evidence showed the policy contract to have been made and delivered in Texas, petitioners urged that all questions concerning

---

[1] "It Is Also Agreed that this insurance shall be void in case this Policy or the interest insured thereby shall be sold, assigned, transferred or pledged without the previous consent in writing of the Assurers."

"Warranted by the Assured that the within named vessel shall be used solely for private pleasure purposes during the currency of this Policy and shall not be hired or chartered unless permission is granted by endorsement hereon."

alleged policy breaches were controlled by Texas law. If Texas law does govern, the policy provision against pledging may be wholly invalid.[2] Furthermore no breach by the insured of the provisions of a fire insurance policy is a defense to any suit under Texas law unless the breach contributes to the loss.[3] Without finding whether the policy had been made and delivered in Texas, the court refused to give that State's law any effect at all, holding that since a marine policy is a maritime contract, federal admiralty law—not state law—governed.[4] The court went on to hold that there is an established admiralty rule which requires literal fulfillment of every policy warranty so that any breach bars recovery, even though a loss would have happened had the warranty been carried out to the letter. Finding that the Wilburns had breached policy provisions against transfer, pledge and

[2] Vernon's Rev. Civ. Stat., 1936, Art. 4890: "Any provision in any policy of insurance issued by any company subject to the provisions of this law to the effect that if said property is encumbered by a lien of any character or shall after the issuance of such policy become encumbered by a lien of any character then such encumbrance shall render such policy void shall be of no force and effect. Any such provision within or placed upon any such policy shall be null and void."

[3] Vernon's Rev. Civ. Stat., 1936, Art. 4930: "No breach or violation by the insured of any warranty, condition or provision of any fire insurance policy, contract of insurance, or application therefor, upon personal property, shall render void the policy or contract, or constitute a defense to a suit for loss thereon, unless such breach or violation contributed to bring about the destruction of the property."

[4] The District Court said: "After much consideration of the above matter, I am of the opinion that the policy involved here is a maritime contract and therefore governed by the general admiralty law and not by the law of Texas, since the policy covered the vessel on navigable waters of the United States, without as well as within the State of Texas, and I find that the waters of Lake Texoma are navigable waters of the United States."

use of the boat,[5] the District Court entered judgment for the insurance company. Approving the District Court's actions in all respects, the Court of Appeals affirmed, saying that "It is the settled doctrine that a marine contract of insurance is 'derived from' is 'governed by', and is a 'part of' the general maritime law of the world." 201 F. 2d 833, 837. Importance of the questions involved prompted us to grant certiorari. 347 U. S. 950.[6]

Since the insurance policy here sued on is a maritime contract the Admiralty Clause of the Constitution brings it within federal jurisdiction. *Insurance Co.* v. *Dunham*, 11 Wall. 1. But it does not follow, as the courts below seemed to think, that every term in every maritime contract can only be controlled by some federally defined admiralty rule. In the field of maritime contracts[7] as in that of maritime torts,[8] the National Government has left much regulatory power in the States. As later

---

[5] There was evidence that prior to the loss the company had notice that the boat was constantly used for commercial purposes. Because of this petitioners urged that the company had waived the policy provision against such use and was also estopped to plead it. Questions involved in these contentions remain wholly open for consideration by the District Court in any new trial that may be had.

[6] The Court of Appeals assumed that if any state law applied it was that of Texas. The question of the appropriate state law is not before us, however, and we express no opinion on that aspect of the case. Cf. *Watson* v. *Employers Liability Assur. Corp.*, 348 U. S. 66. Likewise we are not concerned at this time with whether the District Court's holdings that the Wilburns' transactions constituted breaches, and that the breaches had not been waived by the company, would be correct holdings under state law.

[7] See, *e. g., The Lottawanna*, 21 Wall. 558; *Madruga* v. *Superior Court*, 346 U. S. 556. But cf. *Union Fish Co.* v. *Erickson*, 248 U. S. 308.

[8] See, *e. g., Just* v. *Chambers*, 312 U. S. 383; *The Hamilton*, 207 U. S. 398. But cf. *Pope & Talbot* v. *Hawn*, 346 U. S. 406; *Butler* v. *Boston & Savannah S. S. Co.*, 130 U. S. 527, 557–558.

discussed in more detail, this state regulatory power, exercised with federal consent or acquiescence, has always been particularly broad in relation to insurance companies and the contracts they make.

Congress has not taken over the regulation of marine insurance contracts and has not dealt with the effect of marine insurance warranties at all; hence there is no possible question here of conflict between state law and any federal statute. But this does not answer the questions presented, since in the absence of controlling Acts of Congress this Court has fashioned a large part of the existing rules that govern admiralty. And States can no more override such judicial rules validly fashioned than they can override Acts of Congress. See, *e. g., Garrett* v. *Moore-McCormack Co.*, 317 U. S. 239. Consequently the crucial questions in this case narrow down to these: (1) Is there a judicially established federal admiralty rule governing these warranties? (2) If not, should we fashion one?

The only decision of this Court relied on by the Court of Appeals to support its holding that there is an established admiralty rule requiring strict fulfillment of marine insurance warranties was *Imperial Fire Insurance Co.* v. *Coos County*, 151 U. S. 452. There, because of a breach of warranty, an insurance company was relieved of liability for loss of a courthouse by fire, and this Court said it was immaterial whether the breach contributed to the loss. But no question of marine insurance was remotely involved nor was there any reliance on a marine insurance rule. Writing its own "general commercial law," as was the custom in diversity cases prior to *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, this Court in the *Coos County* case simply followed a general doctrine commonly applied to warranties in all types of insurance.[9] A mere

---

[9] See, *e. g., Phoenix Life Ins. Co.* v. *Raddin*, 120 U. S. 183, 189–190.

cursory examination of the cases, state and federal, will disclose that through the years this common-law doctrine, when accepted, has been treated not as an admiralty rule but as a general warranty rule applicable to many types of contracts including marine and other insurance.[10]   There are very few federal cases on marine insurance in which the strict breach of warranty rule has even been considered.   And only two circuits appear to have thought of the rule as a part of the general admiralty law.[11]   On the contrary, other circuit court decisions, including the ones relied on in those few cases holding the rule to be one of federal admiralty, seem to indicate that state law was followed in applying the rule [12] or that the question was decided as one of "general commercial law," a uniform practice during the era of *Swift* v. *Tyson*, 16 Pet. 1.[13]   This Court did say in one marine insurance case that warranties "must be strictly and literally performed." *Hazard's Administrator* v. *New England Marine Ins. Co.*, 8 Pet. 557, 580.   But there is not the slightest indication that this statement referred to a federal admiralty rule and the Court in fact expressly followed and applied Massachusetts law to decide another question in that very case.

---

[10] See, *e. g.*, cases collected in 87 A. L. R. 1074; L. R. A. 1918B, 429; 34 L. R. A. (N. S.) 563; 11 L. R. A. (N. S.) 981; 29 Am. Jur., Insurance, § 529 *et seq.*

[11] *Aetna Ins. Co.* v. *Houston Oil & Transport Co.*, 49 F. 2d 121 (1931); *Home Ins. Co.* v. *Ciconett*, 179 F. 2d 892 (1950).

[12] *Gelb* v. *Automobile Ins. Co.*, 168 F. 2d 774; *Levine* v. *Aetna Ins. Co.*, 139 F. 2d 217; *Shamrock Towing Co.* v. *American Ins. Co.*, 9 F. 2d 57. See also *United States Gypsum Co.* v. *Insurance Co. of North America*, 19 F. Supp. 767. See Goulder, Evolution of the Admiralty Law in America, 5 Am. Lawyer 314.

[13] *E. g.*, *Canton Ins. Office, Ltd.* v. *Independent Transp. Co.*, 217 F. 213; *Whealton Packing Co.* v. *Aetna Ins. Co.*, 185 F. 108; *Robinson* v. *Home Ins. Co.*, 73 F. 2d 3; *Fidelity-Phenix Ins. Co.* v. *Chicago Title & Trust Co.*, 12 F. 2d 573.

Whatever the origin of the "literal performance" rule may be,[14] we think it plain that it has not been judicially established as part of the body of federal admiralty law in this country. Therefore, the scope and validity of the policy provisions here involved and the consequences of breaching them can only be determined by state law [15] unless we are now prepared to fashion controlling federal rules.

The whole judicial and legislative history of insurance regulation in the United States warns us against the judicial creation of admiralty rules to govern marine policy terms and warranties. The control of all types of insurance companies and contracts has been primarily a state function since the States came into being. In 1869, this Court held in *Paul* v. *Virginia*, 8 Wall. 168, that States possessed regulatory power over the insurance business and strongly indicated that the National Government did not have that power. Three years later, it was first authoritatively decided in *Insurance Co.* v. *Dunham, supra,* that federal courts could exercise "jurisdiction" over marine insurance contracts. In 1894, years after the *Dunham* holding, this Court applied the doctrine of *Paul* v. *Virginia* and held that States could regulate marine insurance the same as any other insurance. *Hooper* v. *California*, 155 U. S. 648. Later, the power of States to regulate marine insurance was reaffirmed in *Nutting* v. *Massachusetts*, 183 U. S. 553. This constitutional doctrine carrying implications of exclusive state power to regulate all types of- insurance contracts remained until 1944 when this Court decided *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533. Thus it is clear that at least until 1944 this Court has always

---

[14] See Vance, The History of the Development of the Warranty in Insurance Law, 20 Yale L. J. 523; Patterson, Warranties in Insurance Law, 34 Col. L. Rev. 595.

[15] *The Hamilton*, 207 U. S. 398, and cases there cited.

treated marine insurance contracts, like all others, as subject to state control.[16]  The vast amount of insurance litigation in state courts throughout our history also bears witness that until recently state legislatures and state courts have treated marine insurance as controlled by state law to the same extent as all other insurance.[17] This is aptly illustrated by a Massachusetts case decided in 1893 which expressly held a generally worded statute of that State relating to warranties to be applicable to marine insurance companies equally with other insurance companies.  *Durkee* v. *India Mutual Ins. Co.*, 159 Mass. 514, 34 N. E. 1133.

Not only courts, but Congress, insurance companies, and those insured have all acted on the assumption that States can regulate marine insurance.  In the Merchant Marine Act of 1920, Congress recognized that marine insurance companies were operating under state laws.[18]  Then, following a three-year study of marine insurance, Congress in 1922 passed a law regulating *all* types of insurance in the District of Columbia.[19]  This enactment generally referred to as the District of Columbia Model Marine Insurance Act, had the backing of insurance companies generally and was hailed as a model which it was hoped States would copy.  Because of a provision in the bill as offered relating to "policy forms and conditions," the bill was first criticized by a national association of shipowners but was later ap-

---

[16] For cases subsequent to 1944 holding that States could regulate insurance, see *Robertson* v. *California*, 328 U. S. 440; *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408.

[17] See cases collected in 9 L. Ed. 1123; 22 L. Ed. 216; 42 L. Ed. 113; 9 A. L. R. 1314; 13 A. L. R. 893; 43 A. L. R. 222; L. R. A. 1917C, 730; L. R. A. 1916F, 1171; 10 L. R. A. (N. S.) 742; 36 Am. St. Rep. 854; 29 Am. Jur., Insurance, §§ 227–237, 758–785, 1032–1051, 1198–1224; note 10, *supra*.

[18] 41 Stat. 1000, 46 U. S. C. § 885 (a) (2).

[19] 42 Stat. 408; D. C. Code, 1951, § 35–1101 *et seq*.

proved after the criticized provision was removed.[20] Hearings on the bill make it plain that shipowners and marine insurance companies recognized that marine insurance was then, and would continue to be, regulated by the States. This model bill which it was hoped would serve as a pattern for States to follow was prompted in part by widespread doubt created by *Paul* v. *Virginia* and *Hooper* v. *California* that the Federal Government could enter the field at all.[21] Again in 1935 marine insurance was discussed in congressional hearings in connection with the Limitation of Liability Act. 49 Stat. 1479, 46 U. S. C. §§ 181–196. There representatives of shipowners strongly opposed regulation of marine insurance by federal authority, arguing that it was better for the States to retain their regulatory function.[22] Finally, in 1944 and 1945, Congress had before it for consideration bills specifically designed to authorize States to continue to regulate the business of insurance. At the very beginning of extensive hearings on these bills the Committee's attention was directed to that part of this Court's opinion in *Hooper* v. *California* deciding that States could regulate the marine insurance business the same as they could regulate other kinds of insurance businesses.[23] Again and again the Committee was reminded of the *Paul* and *Hooper* cases which together showed that States had previously been

---

[20] Hearings before Senate Committee on Commerce on S. 210, 67th Cong., 1st Sess. 111, 112, 213.

[21] *Id.*, at 20–30. See also S. Rep. No. 228, 67th Cong., 1st Sess.; H. R. Rep. No. 582, 67th Cong., 2d Sess.

[22] Hearings before House Committee on Merchant Marine and Fisheries on H. R. 4550, 74th Cong., 1st Sess. 124 *et seq.*

[23] Joint Hearing before the Subcommittees of the Committees on the Judiciary on S. 1362, H. R. 3269, H. R. 3270, 78th Cong., 1st Sess. 7. Attention was also called to *New York Life Ins. Co.* v. *Cravens,* 178 U. S. 389, and other cases which held that States had power to bar policy provisions deemed contrary to the public interest and compel inclusion of provisions deemed to be in the public welfare.

regulating marine insurance as well as all other types. Passage of the bill followed *United States* v. *South-Eastern Underwriters Assn.*, *supra*, holding that, despite the constitutional doctrine embodied in the *Paul* v. *Virginia* line of cases, Congress had power under the Constitution to regulate interstate insurance transactions. In the *South-Eastern* case, however, all the opinions had emphasized the historical fact that States had always been free to regulate insurance. The measure Congress passed shortly thereafter, known as the McCarran Act, was designed to assure that existing state power to regulate insurance would continue. Accordingly, the Act contains a broad declaration of congressional policy that the continued regulation of insurance by the States is in the public interest, and that silence on the part of Congress should not be construed to impose any barrier to continued regulation of insurance by the States.[24]

The hearings on the McCarran Act reveal the complexities and difficulties of an attempt to unify insurance law on a nationwide basis, even by Congress. Courts would find such a task far more difficult. Congress in passing laws is not limited to the narrow factual situation of a particular controversy as courts are in deciding lawsuits. And Congress could replace the presently functioning state regulations of marine insurance by one comprehensive Act. Courts, however, could only do it piecemeal, on a case-by-case basis. Such a creeping approach would result in leaving marine insurance largely unregulated for years to come.[25]

In this very case, should we attempt to fashion an admiralty rule governing policy provisions, we would at

---

[24] 59 Stat. 33, 15 U. S. C. § 1011.

[25] For the multitudinous insurance regulations States have found necessary after long experience, see, *e. g.*, McKinney's N. Y. Laws, Insurance Law; La. Rev. Stat., 1950, Title 22; Vernon's Tex. Rev. Civ. Stat., 1936, Arts. 4679–5068b.

once be faced with the difficulty of determining what should be the consequences of breaches. We could adopt the old common-law doctrine of forfeiting all right of recovery in the absence of strict and literal performance of warranties, but that is a harsh rule.[26] Most States, deeming the old rule a breeder of wrong and injustice, have abandoned it in whole or in part. But that has left open the question of what kind of new rule could be substituted that would be fair both to insurance companies and policyholders. Out of their abundant broad experience in regulating the insurance business, some state legislatures have adopted one kind of new rule and some another.[27] Some States for example have denied companies the right to forfeit policies in the absence of an insured's bad faith or fraud. Other States have thought this kind of rule inadequate to stamp out forfeiture practices deemed evil. The result, as this Court has pointed out, has been state statutes like that of Texas which "go to the root of the evil" and forbid forfeiture for an insured's breach of policy terms unless the breach actually contributes to bring about the loss insured against. *Northwestern National Life Ins. Co.* v. *Riggs,* 203 U. S. 243, 253–254. Thus there are a number of other possible rules from which this Court could fashion one for admiralty. But such a choice involves varied policy considerations and is obviously one which Congress is peculiarly suited to make. And we decline to undertake the task. See *Halcyon Lines* v. *Haenn Ship Corp.,* 342 U. S. 282, 285.

Under our present system of diverse state regulations, which is as old as the Union, the insurance business has

---

[26] For criticisms of the rule see note 14, *supra.*

[27] 4 Couch, Cyclopedia of Insurance Law, § 819 *et seq.;* 12 Appleman, Insurance Law and Practice, § 7251 *et seq.* For instances where state courts have relaxed the rule of their own accord see 4 Appleman, Insurance Law and Practice, § 2695; 12 *id.,* § 7354.

become one of the great enterprises of the Nation. Congress has been exceedingly cautious about disturbing this system, even as to marine insurance where congressional power is undoubted.[28] We, like Congress, leave the regulation of marine insurance where it has been—with the States.[29]

The judgments of the Court of Appeals and the District Court are reversed and the cause is remanded to the District Court for a trial under appropriate state law.

*It is so ordered.*

MR. JUSTICE FRANKFURTER, concurring in the result.

This case concerns a marine insurance policy covering a small houseboat yacht, inappropriately named *The Wanderer*, plying the waters of Lake Texoma, an artificial inland lake between Texas and Oklahoma. The coverage of the policy was specifically restricted to *The Wanderer's* trip to and use on that lake "solely for private pleasure purposes."* After *The Wanderer* was destroyed by fire while lying idle on Lake Texoma, it was discovered that certain warranties of the insurance policy had been

---

[28] Congress has made certain provisions in connection with war risk insurance. 64 Stat. 773, 46 U. S. C. §§ 1281–1294. And to a very limited extent it has authorized governmental agencies to regulate policies and insurance companies which are insuring vessels in which the Government has some interest. 41 Stat. 992, 46 U. S. C. § 868; 52 Stat. 969, 46 U. S. C. §§ 1271–1279; 55 Stat. 243, 50 U. S. C. App. § 1273.

[29] It is faintly contended that the Federal Constitution forbids States to regulate marine insurance, even where Congress acquiesces or expressly consents. This contention is so lacking in merit that it need not be discussed.

*The yacht had been purchased by the Wilburns while at Greenville, Mississippi. The policy had covered port risks at the Greenville yacht basin, the river voyage to Denison, Texas, and the overland "skid" around the dam onto the lake. The policy contemplated that *The Wanderer* would be "locked through to Texoma Lake," but there are no locks permitting water passage onto the lake.

ignored by petitioner. Under a uniform rule of admiralty law governing breach of such warranties, petitioner probably would be unable to recover on the policy. Texas statute law, however, might excuse the breaches of warranty, although this is by no means clear. Our problem is whether this situation—involving a marine policy such as is the basis of litigation—calls for a uniform rule throughout the country applicable to breaches of warranty of all similar marine insurance contracts.

There is no doubt that as to some matters affecting maritime affairs the States are excluded from indulging in variant state policies. *E. g., Chelentis* v. *Luckenbach S. S. Co.,* 247 U. S. 372; *The Lottawanna,* 21 Wall. 558. Equally, there is no doubt that some matters are so predominantly restricted in the range of their significance that a uniform admiralty rule need not be recognized or fashioned. *E. g., Madruga* v. *Superior Court,* 346 U. S. 556; *C. J. Hendry Co.* v. *Moore,* 318 U. S. 133; *The Hamilton,* 207 U. S. 398. Therefore the question, and the only question now to be decided, is whether the demands of uniformity relevant to maritime law require that marine insurance on a houseboat yacht brought to Lake Texoma for private recreation should be subject to the same rules of law as marine insurance on a houseboat yacht "confined," after arrival, to the waters of Lake Tahoe or Lake Champlain. The provision of the policy whereby the insured warranted "that the vessel be confined to Lake Texoma" conveys the emphasis of the situation—the essentially localized incidence of the transaction despite the interstate route followed in reaching the circumscribed radius within which the yacht was to move. It is reasonable to conclude that the interests concerned with shipping in its national and international aspects are substantially unconcerned with the rules of law to be applied to such limited situations. I join in a result restricted within this compass.

Unfortunately, for reasons that I do not appreciate, the Court's opinion goes beyond the needs of the problem before it. Unless I wholly misconceive that opinion, its language would be invoked when cases so decisively different in degree as to be different in kind come before this Court. It seems directed with equal force to ocean-going vessels in international maritime trade, as well as coastal, intercoastal and river commerce. Is it to be assumed that were the *Queen Mary,* on a world pleasure cruise, to touch at New York City, New Orleans and Galveston, a Lloyd's policy covering the voyage would be subjected to the varying insurance laws of New York, Louisiana and Texas? Such an assumption, I am confident, would not prevail were decision necessary. The business of marine insurance often may be so related to the success of many manifestations of commercial maritime endeavor as to demand application of a uniform rule of law designed to eliminate the vagaries of state law and to keep harmony with the marine insurance laws of other great maritime powers. See *Queen Ins. Co.* v. *Globe Ins. Co.,* 263 U. S. 487, 493; *Calmar Steamship Corp.* v. *Scott,* 345 U. S. 427, 442–443. It cannot be that by this decision the Court means suddenly to jettison the whole past of the admiralty provision of Article III and to renounce requirements for nationwide maritime uniformity, except insofar as Congress has specifically enacted them, in the field of marine insurance.

It is appropriate to recall that the preponderant body of maritime law comes from this Court and not from Congress. Judicial enforcement of nationwide rules regarding marine insurance is, as my brother REED cogently shows, deeply rooted in history. What reason is there for abruptly turning over, pending action by Congress, to the crazy-quilt regulation of the different States what so long has been the business of the courts?

As is true of other maritime interests, however, the demand for uniformity is not inflexible and does not pre-

clude the balancing of the competing claims of state, national and international interests. The process and some of the relevant considerations here are not unlike those involved when the question is whether a State, in the absence of congressional action, may regulate some matters even though aspects of interstate commerce are affected. In rejecting abdication of all responsibility by this Court for uniformities in marine insurance and its complete surrender to the States, one is not required to embrace another absolute, complete absorption by this Court of the field of marine insurance and entire exclusion of the States. It is not necessary to assert that uniformity, if it be required in any case, is required in all cases cognizable in admiralty—whether the craft was for business or pleasure, touched in five states, five nations or never left the confines of an inland lake. The deceptive lure of certainty and comprehensive symmetry should not be permitted to conceal the fact that admiralty's expansion beyond "the ebb and flow of the tides" has been a response to demands more inclusive than those for mechanical uniformity.

Under the distribution of power between national authority and local law, admiralty has developed for more than a hundred years by rulings of the Court, but not by absolutes either of abstention or extension. While not able to join the dissenters, I can only hope that what are essentially *dicta* will not be found controlling when situations which have not called them forth, and to which they are not applicable, come before the Court for adjudication.

MR. JUSTICE REED, with whom MR. JUSTICE BURTON joins, dissenting.

The opinion of the Court states that "the crucial questions in this case narrow down to these: (1) Is there a judicially established federal admiralty rule governing these warranties? (2) If not, should we fashion one?"

By question (1) the Court means, as its opinion shows, a federal admiralty rule that a warranty of an insured is to be strictly enforced with the result that a breach of the warranty relieves the insurer of liability for loss although the breach was not shown to have contributed to the loss.

The Court concludes that the literal performance rule has not been established by statute or by judicial decision. It acknowledges that a maritime insurance policy is a maritime contract brought under federal jurisdiction by the Admiralty Clause of the Constitution. *Insurance Co.* v. *Dunham,* 11 Wall. 1. And so it recognizes that the power "to fashion controlling federal rules" rests in the Federal Government—in Congress and the federal courts. However, the Court determines that in the absence of congressional action it will leave the formulation of rules governing marine insurance policies to the States. It applies this conclusion to the effect of a breach of warranty in a maritime insurance policy.

I disagree with both conclusions. Our admiralty laws, like our common law, came from England. As a matter of American judicial policy, we tend to keep our marine insurance laws in harmony with those of England. *Queen Ins. Co.* v. *Globe Ins. Co.,* 263 U. S. 487, 493; *Calmar Steamship Corp.* v. *Scott,* 345 U. S. 427, 442–443. Before our Revolution, the rule of strict compliance with maritime insurance warranties had been established as the law of England.[1] That rule persists. While no case of this Court has been cited or found that says specifically that the rule of strict compliance is to be applied in admiralty and maritime cases, that presupposition has been consistently adopted as the basis of reasoning from our

[1] *Bean* v. *Stupart,* 1 Doug. 11; *De Hahn* v. *Hartley,* 1 T. R. 343 (each reported 99 Eng. Rep., full reprint, 9 and 1130, respectively); 2 Arnould, Marine Insurance (14th ed.), c. 20.

earliest days.[2]   Other courts have been more specific.[3]
No case holds to the contrary.

I am inclined to think that Congress or this Court might
well consider modifying the strict rule insofar as the
breached warranty does not contribute to the loss.   But
since the Court concludes that it will not undertake the

---

[2] *Hodgson* v. *The Marine Ins. Co. of Alexandria,* 5 Cranch 100, 109:
"The insurance in this case being general, as well for the parties
named as 'for all and every other person or persons to whom the
vessel did or might appertain,' and containing no warranty of neu-
trality, belligerent as well as American property was covered by it."

*Livingston* v. *The Maryland Ins. Co.,* 6 Cranch 274, 278:
"The warranty, in this case, is in these words; 'warranted, by the
assured, to be American property, proof of which to be required in
the United States only.'

"The interest insured is admitted to be American property, in the
strictest sense of the term; but it is contended, that Baruro, a Spanish
subject, had an interest in the cargo, which falsifies the warranty.

"Whether Baruro could be considered as having an interest in the
cargo, or not, is a question of some intricacy, which the court has not
decided; and which, if determined in the one way or the other, would
not affect the warranty; because, the assured are not understood to
warrant that the whole cargo is neutral, but that the interest insured
is neutral."

*Hazard's Administrator* v. *New Eng. Mar. Ins. Co.,* 8 Pet. 557, 570;
*Calmar Steamship Corp.* v. *Scott,* 345 U. S. 427, 432–436.

[3] *Ogden* v. *Ash,* 1 Dall. 174 (Common Pleas of Philadelphia
County); *Martin* v. *Delaware Ins. Co.,* 16 Fed. Cas. No. 9,161, p. 894
(C. C. D. Pa.); *Snyder* v. *Home Ins. Co.,* 133 F. 848 (D. C. S. D.
N. Y.); *Whealton Packing Co.* v. *Aetna Ins. Co.,* 185 F. 108 (C. A. 4th
Cir.); *Canton Ins. Office, Ltd.* v. *Independent Transp. Co.,* 217 F. 213
(C. A. 9th Cir.); *Shamrock Towing Co.* v. *American Ins. Co.,* 9 F. 2d
57, 60 (C. A. 2d Cir.); *Aetna Ins. Co.* v. *Houston Oil & Transp. Co.,*
49 F. 2d 121 (C. A. 5th Cir.); *Robinson* v. *Home Ins. Co.,* 73 F. 2d 3
(C. A. 5th Cir.); *Levine* v. *Aetna Ins. Co.,* 139 F. 2d 217 (C. A. 2d
Cir.); *Home Ins. Co.* v. *Ciconett,* 179 F. 2d 892 (C. A. 6th Cir.);
*Red Top Brewing Co.* v. *Mazzotti,* 202 F. 2d 481 (C. A. 2d Cir.);
*United States Gypsum Co.* v. *Insurance Co.,* 19 F. Supp. 767 (D. C.
S. D. N. Y.).

task,[4] it is unnecessary for me to go farther than to say that in the absence of federal amelioration I would follow the established rule of holding the insured to his warranty.[5]

This brings me to the crucial phase of the Court's decision which, so the Court says, "leave[s] the regulation of marine insurance where it has been—with the States." This is the dominant issue here, and the Court's decision strikes deep into the principle of a uniform admiralty law and will have the result of unduly burdening maritime commerce. This is the issue presented by the petition for certiorari and argued in petitioners' brief on the merits.

One rule of law stands unquestioned. That is that all courts, state and federal, which have jurisdiction to enforce maritime or admiralty substantive rights must do so according to federal admiralty law.[6] See particularly the

---

[4] Compare *Halcyon Lines* v. *Haenn Ship Corp.*, 342 U. S. 282, 285.

[5] The facts in this case are that the boat was destroyed by fire of unknown origin while moored in Lake Texoma. "The policy provides that the insurance shall be void in case the interest insured shall be sold, assigned, transferred, or pledged without the previous consent in writing of the assurers, and further that it is warranted by the assured that the vessel shall be used solely for private pleasure purposes and shall not be hired or chartered unless permission is granted by indorsement on the policy." 201 F. 2d, at 834. All these warranties were breached. The insurer might reasonably have required their inclusion before issuing the policy.

[6] *Watts* v. *Camors*, 115 U. S. 353; *Garrett* v. *Moore-McCormack Co.*, 317 U. S. 239, 243. "Even if Hawn were seeking to enforce a state created remedy for this right, federal maritime law would be controlling. While states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court. These principles have been frequently declared and we adhere to them." *Pope & Talbot, Inc.* v. *Hawn,* 346 U. S. 406, 409–410; *Madruga* v. *Superior Court,* 346 U. S. 556, 561; *Maryland Casualty Co.* v. *Cushing,* 347 U. S. 409, 413–419, and conc. 423 *et seq.* Cf. *The Armar,* [1954] 2 Lloyd's Rep. 95, 101 (N. Y. Sup. Ct.). See 1 Benedict, Admiralty (6th ed.), p. 55, n. 77.

excellent discussion by Judge Magruder in *Doucette* v. *Vincent*, 194 F. 2d 834, 841 *et seq.* The issue of an insurer's liability upon an insured's broken warranty is clearly a matter of substantive law.

The Court relies upon *Paul* v. *Virginia*, 8 Wall. 168; *Hooper* v. *California*, 155 U. S. 648; and *Nutting* v. *Massachusetts*, 183 U. S. 553, as holding that "States could regulate marine insurance the same as any other insurance." Those cases only approve provisions of state law that require agents and companies to take out licenses and conform to various conditions preliminary to doing business.[7] The Court also relies on congressional action and inaction, but the fact that Congress has regulated the organization, taxing and licensing of fire, casualty and marine insurance companies in the District of Columbia, and has recognized the existence of marine companies under the Merchant Marine Act of 1920, has no relevancy to whether the provisions of state law should control the effect to be given to warranties in marine insurance policies. Nor does the McCarran Act indicate that States may legislate to change fundamentally maritime insurance law.[8] It was so decided in *Maryland Casualty Co.* v. *Cushing*, 347 U. S. 409, 413. The answer as to whether state or federal law governs marine insurance contracts lies in the nature of the federal admiralty jurisdiction.

The Constitution, Art. III, § 2, provides that "The judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction . . . ." The First Congress enacted that the district courts "shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction . . . saving to suitors, in all cases, the right of a common law remedy, where the

---

[7] In *Durkee* v. *India Mutual Ins. Co.*, 159 Mass. 514, 34 N. E. 1133, the issue of the power of a State to change the admiralty law was not touched upon.

[8] 59 Stat. 33, 15 U. S. C. §§ 1011, 1012.

common law is competent to give it . . . ." [9]   In this manner national control was asserted over maritime litigation.   It was needed because the Republic bordered a great length of the Atlantic littoral and the navigable waters furnished the best avenue of transportation.

Although congressional authority over maritime trade was not expressly granted by the Constitution, the grant of admiralty jurisdiction together with the Necessary and Proper Clause has been found adequate to enable Congress to declare the prevailing maritime law for navigable waters throughout the Nation.[10]   The Commerce Clause aids where interstate commerce is affected, but has not the scope of "navigable waters." [11]   Congressional

[9] Judiciary Act of 1789, § 9, 1 Stat. 77.   There has been no intentional change in meaning by the revision of 1948, 28 U. S. C. (Supp. V, 1952) § 1333, which reads:

"(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

The Reviser's Note states:

"The 'saving to suitors' clause in sections 41 (3) and 371 (3) of title 28, U. S. C., 1940 ed., was changed by substituting the words 'any other remedy to which he is otherwise entitled' for the words 'the right of a common-law remedy where the common law is competent to give it.'   The substituted language is simpler and more expressive of the original intent of Congress and is in conformity with Rule 2 of the Federal Rules of Civil Procedure abolishing the distinction between law and equity."

[10] *The Propeller Genesee Chief* v. *Fitzhugh,* 12 How. 443; this includes power to change the admiralty procedure to trial by jury, *id.,* at 459–460; *In re Garnett,* 141 U. S. 1, 12; *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, 215; *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 385; *Nogueira* v. *N. Y., N. H. & H. R. Co.,* 281 U. S. 128, 138; *Garrett* v. *Moore-McCormack Co.,* 317 U. S. 239, 244; *O'Donnell* v. *Great Lakes Dredge Co.,* 318 U. S. 36, 39; *Pennsylvania R. Co.* v. *O'Rourke,* 344 U. S. 334, 337.

Compare *The City of Norwalk,* 55 F. 98, 105.

[11] *The Belfast,* 7 Wall. 624, 640.   Cf. *O'Donnell* v. *Great Lakes Dredge Co.,* n. 10, *supra.*

power to rest exclusive jurisdiction in the federal courts where, as here, the constitutionally delegated judicial authority exists, is established. *The Moses Taylor,* 4 Wall. 411, 429. The remedy preserved by the savings clause of the Judiciary Act of 1789, "is not a remedy in the common-laws courts . . . but a common-law remedy." *Id.,* at 431. The meaning of the quoted clause becomes plainer when read with the state statute which *The Moses Taylor* held unconstitutional. That statute authorized a "proceeding against the vessel," a strictly *in rem* proceeding in admiralty, *id.,* at 412, 413, different from the common-law action *in personam.* Consequently, when a California resident brought an *in rem* proceeding in a California court, he was pursuing an admiralty remedy, not a common-law remedy. This Court, therefore, held the case outside the savings clause of the ninth section of the Judiciary Act of 1789.[12]

On the other hand, a state court was held to have jurisdiction to sell a vessel to enforce a lien in *Knapp, Stout & Co.* v. *McCaffrey,* 177 U. S. 638, where the suit was against the owner, *in personam,* although in equity for foreclosure of a possessory lien. "[T]he remedy chosen by the plaintiff was the detention of the raft for his towage charges." *Id.,* at 644. As this was a state-approved remedy in the common law, the use of state equity procedure to enforce the lien was held to be in accord with the reservation of a common-law remedy from the exclusive jurisdiction of admiralty.[13] Thus, by

---

[12] The same rule was applied in efforts to enforce state-created liens in state courts by proceedings *in rem* against the boat in *The Robert W. Parsons,* 191 U. S. 17, 37, and in *The Glide,* 167 U. S. 606, 616–618, 623–624.

[13] Mr. Justice Brown wrote for the Court:

"The true distinction between such proceedings as are and such as are not invasions of the exclusive admiralty jurisdiction is this: If the cause of action be one cognizable in admiralty, *and* the suit be

saving a suitor's common-law remedy, Congress has created by § 9 of the Judiciary Act of 1789, now 28 U. S. C. (Supp. V, 1952) § 1333, only a limited exclusive jurisdiction. The state courts may furnish not only a common-law remedy existing at the time of the adoption of the Constitution, for substantive admiralty rights, but also new judicial remedies created by statute; that is, whatever remedy is not strictly *in rem*.[14]

---

*in rem* against the thing itself, though a monition be also issued to the owner, the proceeding is essentially one in admiralty. If, upon the other hand, the cause of action be not one of which a court of admiralty has jurisdiction, *or* if the suit be *in personam* against an individual defendant, with an auxiliary attachment against a particular thing, or against the property of the defendant in general, it is essentially a proceeding according to the course of the common law, and within the saving clause of the statute . . . of a common law remedy. The suit in this case being one in equity to enforce a common law remedy, the state courts were correct in assuming jurisdiction." 177 U. S., at 648.

See also *Rounds* v. *Cloverport Foundry & Machine Co.,* 237 U. S. 303, 308; *C. J. Hendry Co.* v. *Moore,* 318 U. S. 133, 137; *The Moses Taylor,* 4 Wall. 411, 427.

[14] *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U. S. 109, 123–124: "The 'right of a common law remedy', so saved to suitors, does not, as has been held in cases which presently will be mentioned, include attempted changes by the States in the substantive admiralty law [*i. e.,* at p. 124, where it was said of state statutes held unconstitutional, they were "invalid, because their provisions were held to modify or displace essential features of the substantive maritime law"], but it does include all means other than proceedings in admiralty which may be employed to enforce the right or to redress the injury involved. It includes remedies *in pais,* as well as proceedings in court; judicial remedies conferred by statute, as well as those existing at the common law; remedies in equity, as well as those enforceable in a court of law. *Knapp, Stout & Co.* v. *McCaffrey,* 177 U. S. 638, 644 *et seq.; Rounds* v. *Cloverport Foundry & Machine Co.,* 237 U. S. 303. A State may not provide a remedy *in rem* for any cause of action within the admiralty jurisdiction. *The Hine* v. *Trevor,* 4 Wall. 555; *The Glide,* 167 U. S. 606. But otherwise, the State, having concurrent jurisdiction, is free to adopt such remedies,

State authority, however, although it may provide remedies, does not extend to changing the general substantive admiralty law. That is the maritime law existing as a body of law enforceable in admiralty. The extent of the States' power to grant rights arising from maritime incidents is not subject to definition. It may vary as the course or manner of navigation or commerce changes. It exists in some circumstances, see *Just* v. *Chambers,* 312 U. S. 383, 388, and, as indicated both in the majority and minority opinions in the *Jensen* case, 244 U. S. 205, must be determined in each situation.[15] The principles which control the validity of an assertion of state power in the admiralty sphere are, however, clear. State power may be exercised where it is complementary to the general admiralty law. It may not be exercised where it would have the effect of harming any necessary or desirable uniformity.[16] The cases decided by this Court make it plain that state legislation will not be permitted to burden maritime commerce with variable rules of law that destroy that uniformity.[17]

---

and to attach to them such incidents, as it sees fit. New York, therefore, had the power to confer upon its courts the authority to compel parties within its jurisdiction to specifically perform an agreement for arbitration, which is valid by the general maritime law, as well as by the law of the State, which is contained in a contract made in New York and which, by its terms, is to be performed there."

See *Steamboat Company* v. *Chase,* 16 Wall. 522, 530 *et seq.; Panama R. Co.* v. *Vasquez,* 271 U. S. 557, 560–561.

[15] Cf. *Cooley* v. *Board of Wardens,* 12 How. 299, 316; *Standard Dredging Corp.* v. *Murphy,* 319 U. S. 306, 309; *Caldarola* v. *Eckert,* 332 U. S. 155, 158. See *Pope & Talbot, Inc.* v. *Hawn,* 346 U. S. 406, 410, 418.

[16] *Levinson* v. *Deupree,* 345 U. S. 648.

[17] *Kelly* v. *Washington,* 302 U. S. 1, 15; *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 386–387, and cases cited; *Western Fuel Co.* v. *Garcia,* 257 U. S. 233, 242; *Chelentis* v. *Luckenbach S. S. Co.,* 247 U. S. 372, 381 *et seq.,* and cases cited; *The City of Norwalk,* 55 F. 98, 106. See *Madruga* v. *Superior Court,* 346 U. S. 556, 561. 1 Benedict, Admiralty (6th ed.), p. 53. Cf. *Minnesota Rate Cases,* 230 U. S. 352, 399.

Since Congress has power to make federal jurisdiction and legislation exclusive, the situation in admiralty is somewhat analogous to that governing state action interfering with interstate commerce. In the absence of congressional direction, it is this Court that must bear the heavy responsibility of saying when a state statute has burdened the required federal uniformity.[18] It is one thing to allow the States to add a remedy or create a new cause of action for certain incidents arising out of maritime activity. It is quite another thing to relinquish an entire body of substantive law making for a whole phase of maritime activity to the States. Such action does violence to the premise upon which the admiralty jurisdiction was constructed.[19]

It is not only in markings, lights, signals, and navigation that States are barred from legislation interfering with maritime operation. The need for a uniform rule is just as great when dealing with the effect to be given to marine insurance on boats which plough our navigable waters. A vessel moves from State to State along our coasts or rivers. State lines may run with the channel or across it. Under maritime custom an insurance policy usually covers the vessel wherever it may go. If uniformity is needed anywhere, it is needed in marine insurance. It is like the question of seaworthiness which must be controlled by one law. It presents the same problem as a state law controlling the operation of interstate boats. *Kelly* v. *Washington,* 302 U. S. 1, 15. For a State to require policies to be issued under its authority or to require extra-state policies to be interpreted by its laws

---

[18] *Just* v. *Chambers,* 312 U. S. 383, 388, 392; *Kelly* v. *Washington, supra,* at 14–15. Cf. *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 769. See the statement from the international standpoint in *The Lottawanna,* 21 Wall. 558, 572.

[19] Canfield, The Uniformity of the Maritime Law, 24 Mich. L. Rev. 544, 556; Stevens, Erie R. R. v. Tompkins and the Uniform General Maritime Law, 64 Harv. L. Rev. 246, 269.

burdens maritime operations unduly. Shipmasters must know how to handle their vessels to preserve their insurance. Insurers must know the risks they are assuming when they fix their premiums. What law is to govern—that of the State where the insurance contract was issued, the State of the accident, or the State of the forum? It seems an unreasonable interference with maritime activity to allow the many States to declare the substantive law of marine insurance.

The Court refuses to declare the governing maritime law on warranties in this case because it could only be done "piecemeal, on a case-by-case basis." It would prefer to await congressional enactment of a comprehensive code. But questions of contract interpretation and the effect to be given to contract provisions are questions which the Court is particularly equipped to handle. A broad legislative approach might be desirable; but in its absence we could establish a rule governing the effect to be given to breaches of warranties which would be binding on every court in the land. It is certainly not desirable to defer to the legislature of Texas or any other State which, though it can enact a comprehensive code, can make it binding only in its own State. To do so destroys the essential uniformity of the maritime law.

My understanding of the facts and legal issues and the rule to be deduced from the Court's decision forbids my joining the limited concurrence of MR. JUSTICE FRANKFURTER. The policy here is not restricted to the boat's use on Lake Texoma nor to its use in any one State. In addition to its use on the lake, the policy covered a "cruise from Greenville, Mississippi via Mississippi and Red Rivers to Denison, Texas" and then to the lake. The waters of five States were navigated before reaching the lake, which is itself an interstate body of water lying between Texas and Oklahoma. The considerations which lead me to favor a uniform rule are not changed simply

because a relatively small boat was here involved, or the number of States through which it passed were few, or because its ultimate destination was a small lake.

This state rule of law covering the incidents of marine insurance affects not only Texas or Lake Texoma but the longest voyage within the cruising capacity of *The Wanderer*. As is shown by *The Hamilton*, 207 U. S. 398, such an exercise of state power permits the States to declare the applicable laws of marine insurance even on the high seas. The event of loss must always be local, but the coverage of the policy is general.[20] When state power intrudes upon the uniformity imposed by federal law, its exercise is invalid when applied to maritime litigation whether the application occurs in litigation arising from an incident that happens on a small lake or a mighty river.

I would affirm.

---

[20] See *The City of Norwalk*, 55 F. 98, 106.