**Howard BOND, Plaintiff,**

v.

**RELIANCE INSURANCE COMPANY, Defendant.**

**Civ. No. 8307-M.**

United States District Court
S. D. Florida,
Miami Division.

June 3, 1959.

W. F. Parker, Miami, Fla., for plaintiff.

Smathers, Thompson & Dyer, Miami, Fla., for defendant.

LIEB, District Judge.

This Suit, to recover the proceeds of a hull policy, was tried to the Court without a jury. It is a companion suit to W. F. Hempstead and A. F. Hempstead, d/b/a Dunn's Boat Yard v. Yacht Escapade ex Thor II etc., No. 1485–N–Adm. The Court, having heard the testimony and having considered the briefs of counsel, now makes the following findings of fact and conclusions of law.

### Findings of Fact.

1. Howard Bond, plaintiff, is a citizen and resident of the State of Florida, engaged in the business of buying and selling yachts.

2. The defendant, Reliance Insurance Company, formerly known as Fire Association of Philadelphia, is a corporation organized and existing under the laws of Pennsylvania.

3. The amount in controversy exceeds $3,000 exclusive of interest and costs. This suit was filed prior to July 25, 1958.

4. The yacht Escapade, formerly known as Thor II, was purchased by plaintiff, Howard Bond, in October, 1957, from one Frank Hart.

5. At the time of purchase it was covered by defendant's Policy Y 13–72–78.

6. At plaintiff's request the policy was transferred, by endorsement thereon, to him as owner, "losses if any, payable to assured and Coconut Grove Bank." Plaintiff personally sent this policy to the Coconut Grove Bank, the mortgagee. This policy contained the usual "private pleasure warranty" as part of the printed conditions of the policy.

7. Policy Y 13–72–78 expired about a month after the date of the foregoing endorsement. Plaintiff, Howard Bond, notified his marine insurance broker, Hansen, an agent of the defendant, to renew the policy "as it now stands."

8. Pursuant to the said request Policy Y 21–08–92 was issued November 19, 1957, containing the same terms as Y 13–72–78. The original of the policy was sent directly to the Coconut Grove Bank, and a résumé of the policy coverage known as "daily worksheet" was sent to Bond. This "daily" noted that one of the terms was the "private pleasure warranty" without setting out the warranty in full.

9. On January 30, 1958, the Escapade was delivered to a charterer under a charter entered into by the owner on January 25th.

10. On February 8, while still under charter the vessel stranded on a sand bar in the Bahamas.

11. Plaintiff reported the stranding to the office of his said insurance agent, Hansen, on the morning of February 11, immediately upon learning of the stranding. Hansen's office immediately called in a marine surveyor, McClaskey, who flew to the vicinity of the stranded vessel, but was unable to board it because of the weather. He then arranged, by telephone, from Cat Cay with Hempstead Bros. in Miami to undertake salvage operations as soon as possible.

12. On the morning of February 12 Hansen first learned of the existence of the charter and received a copy thereof from Bond.

13. On the afternoon of February 12, Hansen and an employee, Meyers, visited plaintiff's office. On this occasion plaintiff was advised by Hansen that the defendant would not accept abandonment, that it was incumbent upon plaintiff to protect his property; that he would have to authorize a salvage operation. There is a hopeless conflict in the testimony as to whether Hansen told Bond the insurance company would pay the costs of salvaging the vessel. Hansen did not, at this time, deny liability.

14. Plaintiff signed a letter authorizing Mr. Arthur Hempstead of Dunn's Boat Yard, Miami, to salvage the yacht, Escapade, and deliver it to the Allied Marine Boat Yard. This letter was picked up on the afternoon of Feb. 12 by McClaskey who then flew to Cat Cay and delivered the letter to Casey, Hempstead's representative, who had arrived

with the salvors' equipment, but had not as yet begun salvage operations.

15. The vessel was brought to the Allied Marine Boat Yard by the salvors on February 19, 1958. (It is stipulated that a fair and reasonable sum in payment of the salvage contract is $2,700.)

16. Plaintiff authorized the Allied Marine Boat Yard to work on the vessel. Work, so authorized by plaintiff, was done, based on a preliminary survey by McClaskey. This work was done to ready the vessel for a major survey to be performed later. It is stipulated that a fair and reasonable charge for work performed by Allied Marine Corporation is $1,095.99.

17. Plaintiff was notified by Hansen on March 7, 1958, that defendant was denying liability. This was done by letter. No ground was given in the letter for the denial.

18. On April 19, a survey of the vessel was performed by a representative of the insurer, by a representative of the owner, and by an independent marine surveyor. A report was rendered on April 21, 1958.

19. As a result of said report, bids were solicited for the work thought to be required. Such bids ranged in price from $19,890 to $28,500. The vessel has not been repaired and has deteriorated further as a result of exposure to the elements. There was testimony which indicated that it would probably cost considerably more now to restore it to a first class condition, than at the time the estimates were submitted.

### Discussion.

Although on the surface this case appears complex, the complexities which have been injected into it are really irrelevant. There is one factual dispute, turning on credibility, but of no real practical importance to the decision. There are in addition a few issues of law to be applied to the facts which may warrant some discussion.

The first issue of law is the effect of the "private pleasure warranty." It was admittedly contained in both the original policy and the renewal. Bond, a yacht broker for twenty years in this community had the original policy in his own possession, and a copy of the daily work sheet on the renewal policy was mailed to him. This warranty is a printed part of yacht policies and Bond is charged with knowledge of its presence in the policy. He accepted the policy and renewal, and paid the premium therefor, without ever protesting the presence of the warranty in the policy.

No one seriously disputes that the warranty was breached. Plaintiff, however, strongly urges that any breach of the policy was waived by the conduct of the insurer's agent, Hansen, after he had received knowledge of the breach. Some cases [1] seem to consider the "private pleasure warranty" as a true promissory warranty, breach of which will defeat recovery, others [2] seem, perhaps more logically, to consider warranties of this type as a provision for suspension of coverage during the period of violation. But, whichever view be taken, conduct of the insurer subsequent to the latter's acquisition of knowledge of the breach may estop the insurer to rely upon such breach.[3] Although variously denominated waiver or estoppel, it seems clear that there is no intentional relinquishment of a right so as to constitute a true waiver and that an estoppel is meant. This is even more apparent in that a large number of the cases hold

1. Tinsley v. Aetna Insurance Co., 199 Mo. App. 693, 205 S.W. 78; Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310, 316, 75 S.Ct. 368, 99 L. Ed. 337.

2. Schaefer v. Home Insurance Co., 1946, 239 Mo.App. 586, 194 S.W.2d 718; Doerr v. National Fire Insurance Co., 1926, 315 Mo. 266, 285 S.W. 961, 54 A.L.R. 1336; Henjes v. Aetna Insurance Co., 2 Cir., 132 F.2d 715.

3. Bankers Life & Loan Ass'n of Dallas v. Ashford, Tex.Civ.App., 139 S.W.2d 858; Tinsley v. Aetna Insurance Co., footnote 1 supra.

that mere silence, or failure to act, on the part of the insurer is not sufficient to relieve insured of the effects of his breach, but rather there is required conduct calculated to induce insured to act to his detriment in reliance thereon, and acts in reliance thereon by which insured will unjustly be subjected to detriment unless the insurer is held estopped.[4]

■ There is a sharp conflict noted in the evidence as to the exact promises and representations made by Hansen at the crucial meeting in insured's office on the afternoon of February 12. By Hansen's own testimony, however, he told Bond that the company would not accept an abandonment and Bond would have to look after and protect his own property. Neither of these statements can have any rational significance in the face of a denial of liability by insurer. They can become meaningful only in a context predicated upon continuing liability, for insurer is not concerned with abandonments if it denies all liability, and the only compulsion upon the insured to care for his damaged property is his desire to do all required by the "sue and labor clause"; thus to keep the policy in force and so become entitled to a recovery. At Hansen's insistence, in the light of the foregoing, Bond signed a letter authorizing the contract "salvage" of his yacht by a salvor of Hansen's choosing, after a preliminary inspection by a marine surveyor chosen by Hansen, who was later to be a representative of the insurer on the three man survey team. Certainly such representations and conduct by the insurer's agent, subsequent to his receipt of a copy of the charter induced Bond in reliance thereon, to authorize the bringing in of the yacht and the preliminary work performed at the boat yard in readying the ship for survey. The actual denial of liability by the insurer did not come until some six weeks after the events here discussed.

Bond and his wife claim emphatically that Hansen promised that the insurer would pay the costs of bringing in the vessel. Hansen and his employee Meyer just as emphatically deny that such a specific promise was made. It is really unnecessary to decide where the truth lies on this specific point; the other representations and conduct of Hansen, plus Bond's reliance thereon, to his own detriment, are quite sufficient to estop the insurer from relying on the breach of the pleasure warranty. This being so, the policy itself, in the "sue and labor clause" clearly obligates the insurer to reimburse Bond for monies expended in recovering the vessel.

■ The only testimony as to a reasonable estimate on repairs was that of Captain Manson, of Allied, who testified that $19,890.05 was the figure for which Allied Marine would do the job. This witness, president and general manager of Allied Marine, testified that when he gave an estimate, it was the offer of a contract at a fixed price and that price would be adhered to if the offer were accepted. He further testified that all work was guaranteed first class. While there are other estimates admitted into evidence, there was no testimony as to their reasonableness, or the type work that would be done. All were higher than Manson's and all were based on the same survey. Therefore the best available evidence that the Court has seems to indicate that the vessel could have been put in a guaranteed first class condition for $19,890.05. This, of course is not sufficient to constitute a constructive total loss warranting an abandonment under the provisions of this policy. Bond originally attempted abandonment without knowing the condition of the vessel which of course was unreasonable. After the condition was ascertained it was obvious that there was no constructive total loss within the meaning of the policy. The policy provides "No recovery for a constructive total loss shall be had hereunder unless the expense of recovering and repairing the vessel shall exceed the 'Agreed valuation'." The

4. Tinsley v. Aetna Insurance Co., footnote 1 supra.

agreed valuation is $30,000, the same amount as the coverage.

 Therefore plaintiff is entitled to recover only for a partial loss. The subsequent deterioration of the vessel was proximately caused not by stranding, nor by any peril covered by the policy but rather by plaintiff's failure to carry out the repairs which the survey showed were necessary. Plaintiff could, of course, choose not to repair and to insist on his abandonment and claim of total loss, but he ran the risk of having the Court decide against him on that score. By an unauthorized abandonment and a refusal to repair—and only he as owner could authorize such repairs—he cannot convert what was at the time of the loss only a partial loss into a total loss at the time of judgment. Therefore plaintiff is entitled to recover that sum which the best available evidence shows he was entitled to at the time of the survey report or shortly thereafter. Furthermore he is entitled to recover the $1,095.99 already incurred in preparing the vessel for survey. In addition under the law of this State he is entitled to a reasonable attorneys' fee which the Court fixes in the sum of $4,000. Plaintiff is also entitled to be reimbursed for his actual expenses in bringing the yacht into Miami, under the "sue and labor clause." However this amount is the subject matter of a third party action in No. 1584–M–Admiralty, being decided herewith.

### Conclusions of Law.

1. The Court has jurisdiction of the parties and the subject matter of this action under 28 U.S.C. § 1332.

2. On the date of stranding there was a valid and subsisting hull policy in effect.

3. Plaintiff breached the "private pleasure warranty" of the policy by chartering the yacht.

4. Defendant is estopped to rely upon such breach by its conduct, inconsistent with such reliance, by which conduct plaintiff was induced to act to his detriment.

5. Plaintiff is entitled to judgment in the amount of $20,986.04, plus interest at 6% per annum from March 7, 1958, plus costs of this action, together with an attorneys' fee of $4,000.

6. Submit judgment on notice.