## SHAMROCK TOWING CO. v. AMERICAN INS. CO. et al.

(Circuit Court of Appeals. Second Circuit. May 11, 1925.)

No. 312.

**1. Insurance ⬤⟳665(3)—Evidence held to show that captain of scow was not aboard when it sank.**

In libel against insurance company for damages resulting from sinking of scow, evidence *held* to warrant finding that captain was not aboard at the time she sank, and that warranty of policy to keep competent watchman on board was breached.

**2. Insurance ⬤⟳334(2)—No repugnancy between warranty in policy that watchman would be on board at all times and warranty that watchman would be in charge when vessel without cargo, and policy avoided where watchman not on board loaded vessel.**

Warranty in body of policy of marine insurance that scow would at all times have a competent watchman on board *held* not repugnant to or limited by warranty attached to policy that, when vessel was laid up without cargo, "it shall be in charge of a competent watchman"; the latter warranty, requiring watchman to be in charge, but not on board vessel, not being applicable when vessel was lying at dock with cargo, in which case absence of watchman was breach of warranty avoiding policy.

**3. Insurance ⬤⟳267—Warranty in a contract of insurance must be literally complied with.**

Warranty in a contract of insurance must be literally complied with.

**4. Insurance ⬤⟳150—Rider to insurance policy does not supersede policy itself.**

Rider to insurance policy does not supersede policy itself, unless it expressly so provides.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Shamrock Towing Company against the American Insurance Company and others. Decree of dismissal, and libelant appeals. Affirmed.

The libelant is a corporation organized under the laws of the state of New York. It filed a libel as the sole owner of the scow Shamrock No. 25, which vessel was employed in transporting and conveying merchandise in and around the harbor of New York and the adjacent and tributary waters. The libel alleged that on March 6, 1920, it insured with the respondents its scow in the sum of $5,000; each of the respondents severally being liable for any claim arising under the policy in a specified proportionate part of the amount covered by the policy.

The scow, with a cargo of fertilizer on board, on April 26, 1920, arrived at Greenville, on the New Jersey side of the Hudson river, where it was "made safely and securely fast" to the pier. During the succeeding night at low water she took the bottom and listed. On the succeeding flood tide she did not rise, but the water flowed over and filled her, opening her seams and butts, straining her hull, and causing her other material injuries. The libel charged that the scow sustained damages in the sum of $1,458.25, for which payment was asked.

The answer admitted the issuance of the policy of insurance as alleged, and that the respondents became severally liable under it for any loss occurring within its terms in the proportions stated in the libel. It denied certain material allegations of the libel, which it is not necessary now to set forth, and in addition alleged as a defense that whatever damage the vessel sustained was occasioned by a breach of warranties contained in the policy, and which are set forth in the opinion of this court. The court below dismissed the libel on the ground that libelant had breached the warranty.

Alexander & Ash, of New York City (Mark Ash and Edward Ash, both of New York City, of counsel), for appellant.

Foley & Martin, of New York City (James A. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellees.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This libel was filed to recover on a marine policy of insurance. The libelant has brought the case into this court, appealing "from each and every part" of the decree. The decree was entered on June 25, 1923. It dismissed the libel, with costs taxed at the sum of $84.88. The sole reason which the District Judge gave for dismissing the libel was that the libelant had not complied with the warranty.

The uncontradicted evidence shows that the scow was in good condition and seaworthy. The evidence shows that the berth

at which the boat was tied up, and where she sank, had boulders and cobblestones on the bottom. She was berthed at high water, and on that account her lines were made tight. The captain of the boat testified that he left the boat about 5 o'clock in the afternoon, and was absent on shore for perhaps three hours, having gone ashore to get provisions; that when he got back he slacked his lines, then cooked his food, and turned in, but before turning in he sounded his boat and found no water in her. The following is an excerpt from his testimony:

"Q. Did your boat remain in her berth in safety all night, or did something happen? A. No, sir; she got on the bank; she listed. I could not get her off, and the water came up on the hatch, and I went ashore, and the water came into the hatch, and she sank.

"Q. About what time was it that she got on the bank? A. About 10 o'clock.

"Q. And what was the condition of the tide at that time? A. Low water."

On essential points he was flatly contradicted by other and disinterested witnesses. A disinterested witness working at the place where the boat was tied up testified as follows:

"Q. Now, after that boat was made fast to the pier, what did the captain of the boat do? A. Well, when a boat is made fast, it is up to the captain to watch his boat, and to watch his lines for the rise and fall of the tide.

"Q. What did he do when the boat was made fast? A. To my knowledge he went home, around a quarter or half past 4.

"Q. Did you see him leave the boat? A. Yes; he spoke to me on his way up. * * *

"Q. And you stayed working there how late? A. A quarter of 5; we had to stay there until a quarter of 5; we were not allowed to leave the tractor until then.

"Q. Did the captain of the boat come back while you were there? A. No.

"Q. Did you see the boat when you left? A. Yes, sir.

"Q. Did you notice it? A. Yes, sir.

"Q. Did you notice whether or not there was anybody on board? A. Not to my knowledge. * * *

"Q. When did you next come back to the boat? A. seven o'clock next morning.

"Q. When you came back at 7 next morning, what was the condition of the boat? A. The boat had a big list offshore and was all under water.

"Q. How were its lines? A. Tight, although she had turned over on the offshore side. * * *

"Q. And this boat, as you saw it, its lines were in what position, in the morning? A. The lines were tight, stiff as a piece of wood; they were apparently holding the inshore side of the boat up.

"Q. Up against what? A. Up against the dock.

"Q. Did the lines reach down on an angle, or straight out? A. The lines would reach down.

"Q. You say they were tight? A. Yes, sir.

"Q. Tight enough to hold up the side of the boat? A. Yes; that is what was holding it up.

"Q. And was there a list offshore on the boat? A. The offshore side was right on the water.

"Q. Now, then, what was done about unloading the boat? A. Why, about 8 o'clock they sent two of us down there to unload it; 8 a. m.

"Q. Was there any captain there then? A. Not the first thing in the morning; no.

"Q. Was there any captain when you came there at 7 o'clock? A. No, sir.

"Q. Any captain around there at 8? A. No, sir.

"Q. Or at 9 o'clock? A. No, sir; not at 9; not as early as that.

"Q. You commenced unloading at 8? A. Yes, sir.

"The Court: When did you see the captain?

"The Witness: As near as I can recollect, it was around 10, between 10 and 11.

"Q. Where did you see him, then? A. He came down the dock from the city.

"Q. Had you started unloading before the captain came? A. Yes; we had started before he came.

"Q. You had been working for some time? A. Yes, sir.

"Q. Did you see the captain walking down the pier from up towards the city? A. Yes, sir. * * *

"Q. Are you sure he was not around that place from the time you got there in the morning until he came down the pier? A. No; we went on the boat to look, but could not find him. We thought probably he had been in the cabin when the boat went down.

"Q. How did you find the cabin, open or closed? A. A padlock on the outside of the door of the cabin.

"Q. How many of you were looking to try to find the captain there that morning? A. I suppose four or five of us.

"Q. Searching for the captain? A. Yes, sir."

Another witness who had charge of the unloading of manure from the boats at the pier testified as follows:

"Q. What was the condition of the lines on the 25 on that morning, if you could see them? A. Why, all you could see is the lines had a strain on from the weight of the boat being sunk. They were very tight.

"Q. Did you continue there? A. Yes; we continued working there. We put a crew on and started to unload her, and the tide was dropping, and then you could see the whole boat.

"Q. When the tide fell, so that you could see the whole boat, just tell us what the condition of things were? A. Well, first, when we started to work, we were all worried about the captain.

"Mr. Alexander: Mr. Martin asked you to tell what the conditions were, the condition of the boat.

"Q. Yes; what you saw and what you did? A. While we were unloading her, and when the tide was dropping, of course the first thing I done, I jumped on board the boat to see the conditions of the boat, and to see if any one was on the boat. I looked in the window and could not see any one. The cabin was sticking out above the water as the bow dropped. I came to the door, to see if the door was open, and there was a padlock outside the door, and there was no one inside.

"Q. And the door was locked by a padlock? A. Yes, sir; on the outside. * * *

"Q. Did you remain around there all day? A. Yes, sir.

"Q. Did you see the captain of the boat that day? A. That afternoon, I think it was around 1 o'clock or so, he came down.

"Q. He came from where? A. Down from the city.

"Q. How far away about was the city? A. The city is about a mile and a half, what we call Greenville.

"He came down along the pier? A. Yes, sir; walking down from the city.

"Q. When you saw him coming down, did you have any talk with him? A. Yes, sir; I walked out to him, and I said, 'You are a lucky man; we figured you were dead in the cabin,' and he was surprised. He said, 'Why?' I said, 'The boat is sunk; we just unloaded her and made her light.' He did not say a word to me. He walked off the dock with surprise. * * *

"Q. Was the captain of the 25 around that place at all that day before the occasion you have spoken of, when you went up and met him and told him he was a lucky man? A. No, sir; I did not see the captain, because I was looking all over the place.

"Q. You were searching for him? A. Searching for him.

"Q. Did other people help you to make the search for him, to try to find him? A. Yes, sir.

"Q. And you could not locate him? A. No, sir; we could not locate him. We even asked the captain of the 18 if he had seen him, and he says he did not see him. We were all worried that he was under water."

The president of the Shamrock Company testified the "captain" or bargeman advised his office of what had taken place between 9 and 10 o'clock in the forenoon of the day after the accident.

[1] The District Judge, who heard and saw the witnesses, thought incredible the testimony of the captain that he was on the boat the night the accident occurred. We think he was quite justified in disbelieving his testimony. In our opinion, the man was absent from the boat, and the boat sank because she was tied up tight to hold her fast on the rising tide, and no one was present to loosen her lines when the tide ran out. There was no one on her to give assistance when she began to sink.

[2] This brings us to consider the policy of marine insurance on which this libel was filed. In the body of the policy the warranty read that "she [the vessel] shall at all times have a competent watchman on board, and that, whenever said vessel shall lie at anchor in the nighttime, she shall show one or more lights in a conspicuous place, so as to warn and give notice to approaching vessels." Attached to and forming part of the policy, which contained a number of warranties, was the following: "Warranted that, when this vessel is actually laid up without cargo, it shall be in charge of a competent watchman." No part of the first of the warranties, above quoted, and which provided that the vessel "shall at all times have a competent watchman on board," was deleted, but on the margin of the attached sheet was stamped in red ink the last warranty above set forth. We do not think that the last of these two warranties was intended wholly to supersede the first.

The law is well settled that, where the clauses in the policy can be construed together, they are to be so construed, but where the repugnance is complete one provision excludes the other. We have no doubt that in the pending case the provisions in

the warranty clauses are not repugnant, and each may prevail within its own scope. The warranty that the vessel shall "at all times have a competent watchman on board" is applicable when she is not laid up without cargo. In such a case the first warranty is applicable. But when she is laid up without cargo the first warranty is not applicable, being modified by the second, which provides that in such an event she shall be "in charge of a competent watchman." The repugnance between the two provisions is not complete between the first and second warranty, and the first warranty is in force so far as they are not repugnant, and the first is modified only so far as they are inconsistent. When the vessel is not laid up without cargo, there must be a watchman on board. When she is laid up and without cargo, she must be in charge of a watchman. To be in charge of a watchman when so laid up, he need not be on board. We think the distinction is real and important; and as the Shamrock No. 25, at the time she sank, was not "laid up without cargo," the first warranty applied to her, and, as we are satisfied that at that time there was no watchman on board the vessel, the policy was avoided.

[3] A warranty in a contract of insurance must be literally complied with. The only question in such cases is whether the thing warranted to be performed was or was not performed. The rule is correctly stated in Arnould on Marine Insurance (11th Ed.) vol. 1, p. 713, § 531, as follows: "In the case of a warranty, all questions of the materiality or immateriality of the fact warranted are entirely excluded; the sole inquiry is whether it be or be not warranted that the fact is or shall be so and so. If it be warranted, then, however unimportant the fact may be to the risk, however little its existence or nonexistence may have influenced the judgment of the underwriter as to the rate of premium, the thing warranted must be absolutely true or literally performed; otherwise, the policy will be void as from the date of the breach of the warranty."

In Snyder v. Home Ins. Co., 133 F. 848, a case in the Southern district of New York, there was a warranty in the policy that the canal boat should at all times have a competent watchman on board. The boat was lying at a dock in Jersey City on the night of June 10, 1903. During the absence of the master and crew the boat filled with water and sank. Several persons on the night when the accident happened had visited the boat at intervals to see that she was in safety.

Judge Holt dismissed the libel, saying that "in any case a breach of an express warranty in a policy * * * bars a recovery, whether it caused any injury or not." The cause of the injury was not clearly ascertained, but the suggestion was made that the injury was due to the malicious acts of men engaged in a labor strike. The case was appealed to this court, where it was affirmed in open court. 148 F. 1021, 79 C. C. A. 536.

In Whealton Packing Co. v. Ætna Insurance Co., 185 F. 108, 107 C. C. A. 113, 34 L. R. A. (N. S.) 563, the record showed that the watchman on the steamer went ashore for the purpose of changing his clothing. He testified that he did not think he was absent from the vessel for more than 10 minutes, and on his way back he learned the boat was on fire, and that he immediately called for help. There was, however, the testimony of another witness, who testified to the effect that the watchman was absent from the vessel from 2½ to 3 hours. The court below found as matter of law that, as the plaintiff admitted that at the time the fire broke out, and for a time prior thereto, it did not have a competent watchman on board the steamer, it had failed to comply with the warranty and its breach voided the policy. This was affirmed in the Circuit Court of Appeals for the Fourth Circuit, which said:

"While it may be entirely true that some of the courts of this country have gone too far in holding that the breach of an express warranty in an insurance policy, whether material to the risk or not, whether a loss happened through the breach or not, absolutely determines the policy, we are not called upon to either discuss or determine the question in this case. Here the insured warranted that his boat should 'at all times have a competent watchman on board,' and the evidence is undisputed that, while the boat was lying at wharf, the sole watchman aboard went ashore to secure a change of clothing, and while absent the boat caught fire and was consumed. The very fact that his presence at the time was so essentially necessary to put out the fire and prevent the loss clearly demonstrates the insurance company's right to stand upon the express warranty made in the contract that he would be there for that purpose. His absence was certainly not immaterial to the risk, and it is a very reasonable presumption that the loss could have been avoided if he had been there, performing his duty. It seems clear that the breach of this warranty by the

agent of insured without his knowledge must be held, nevertheless, a violation by the insured with whom alone the company contracted."

The conclusion we have reached is in accord with the following cases, decided in the courts of New York: Kratzenstein v. Western Assurance Co., 116 N. Y. 54, 57, 22 N. E. 221, 5 L. R. A. 799; Cary v. Home Insurance Co., 199 App. Div. 122, 191 N. Y. S. 529, affirmed in 235 N. Y. 296, 139 N. E. 274; Cogswell v. Chubb, 1 App. Div. 93, 36 N. Y. S. 1076; Couch v. Farmers' Fire Insurance Co., 64 App. Div. 367, 72 N. Y. S. 95.

[4] It was argued in this court that in all kinds of insurance policies a rider supersedes the policy itself, and our attention is called to the decision of this court in New York & Porto Rico Steamship Co. v. Ætna Insurance Co., 204 F. 255, 122 C. C. A. 523, in which we affirmed the court below in 192 F. 212. In that case it is true that this court held that the rider displaced all the terms of the policy. But we so held because the rider contained the following clause: "The terms and conditions of this form are to be regarded as substituted for those of the·policy to which it is attached; the latter being hereby waived." This clause sufficiently explains why the rider superseded the policy. And our attention was also called to St. Paul Fire & Marine Insurance Co. v. Kidd, 55 F. 238, 5 C. C. A. 88, also decided by this court. It lays down no such proposition as is here contended for. In that case the rider was inconsistent with certain provisions in the policy, and to the extent of that inconsistency the rider superseded the policy.

Decree affirmed.