Jere WILMERING, Sr., et al.,
Plaintiffs/Appellants/Cross-Respondents,

v.

LEXINGTON INSURANCE COMPANY,
Defendant/Respondent,

Lawton-Byrne-Bruner Insurance Agency
Company, Defendant/Cross-Appellant,

and

Stoehner Security, Inc., Defendant.

Nos. 47131, 47153.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 21, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 28, 1984.

Application to Transfer Denied
Nov. 20, 1984.

See also Mo.App., 599 S.W.2d 11.

John J. Frank, St. Louis, for plaintiffs/appellants/cross-respondents.

Paul R. Hales, St. Louis, for defendant/respondent. Gerre Strehlman Langton, St. Louis, for defendant/cross-appellant.

SMITH, Judge.

Plaintiffs, as statutory trustees of the Cotton Blossom Corporation and individually, sued Lexington Insurance Company, Lawton-Byrne-Bruner Insurance Agency and Stoehner Security, Inc. to recover losses sustained by the corporation and damages allegedly sustained by the individuals as a result of the sinking of the Cotton Blossom in the Mississippi River. The jury found for Lexington on plaintiffs' claim based on a marine insurance policy. That claim was in two counts, the first seeking recovery under the policy and the second seeking recovery for vexatious refusal to pay. Plaintiffs have appealed from that judgment. The jury found for the plaintiffs and against Lawton-Byrne-Bruner on plaintiffs' claim of negligence that that company as brokers failed to advise plaintiffs of the existence of a watchman warranty in the policy and the consequences of the warranty. The verdict awarded the trustees $351,636.04, Jere Wilmering, Sr. as an individual $500, Starr Wilmering $1500, and Jere Wilmering, Jr. $3000. Lawton-Byrne-Bruner has appealed that judgment. The trial court directed a verdict in favor of Stoehner on plaintiffs' claim that it had breached a contract with plaintiffs by failing to have a watchman on board the Cotton Blossom prior to the sinking. No appeal was taken from that judgment.

The Cotton Blossom was a river steamer originally named the Minnesota and built in about 1904. It was acquired by the Wilmerings in 1976 for conversion to a floating restaurant to be moored on the St. Louis waterfront. The Wilmerings expended considerable personal effort and borrowed money to effectuate the conversion. On April 29, 1977, preliminary to bringing the boat to the riverfront they had the vessel surveyed by a marine surveyor, Jack Stewart. His report stated the hull to be water-

tight and with "sufficient remaining strength in frames and bulkheads to consider it safe for use as a moored hull or for conversion for use as a floating Restaurant Boat." The report noted that the interior of the hull was found tight with no evidence of any hull leaks or temporary repairs. No evidence of damage was found to the exterior of the hull above the waterline.

Initially the Wilmerings obtained insurance on the vessel through a broker other than Lawton-Byrne-Bruner. They were dissatisfied with the amount of the premium and the size of the deductible and approached the Todorovich brothers of Lawton-Byrne-Bruner to see if a cheaper policy with smaller deductibles could be found. The Todorovichs prepared an application based on information given to them by the Wilmerings which was submitted to Lexington. That application stated that someone would be aboard 24 hours per day. A copy of the Stewart survey was included with the application. Lexington issued its policy for one year effective July 18, 1977.

The policy included two basic sections. The first was a standard hull and contents coverage for $165,000 with $10,000 deductible on the hull coverage and $1000 deductible on the contents. The second section provided coverage for collision liability resulting from breakaway and for removal of wreck with a combined single limit of $1,000,000 and a $1000 deductible. The policy then contained the quaintly worded "perils" clause standardly utilized in ma-

rine insurance policies for at least 400 years.[1] The policy also covered damage to or destruction of the property directly caused by vandalism, sabotage, or malicious mischief. The policy included some but not all of the perils standardly covered in the "Inchmaree" clause utilized by marine insurance companies to broaden coverage to include perils held in *Thames & Mersey Marine Ins. Co. v. Hamilton, Fraser & Co.*, 12 App.Cas. 484 (House of Lords 1887) not to be perils of the sea. Section I contained three warranties and an exclusion. The warranties and the exclusion are set forth in the margin.[2] Section II provided in part A "This insurance covers such sums as the assured, as owner of the Cotton Blossom shall have become legally liable to pay and shall have paid on account of loss of, or damage to, or expense in connection with collision between the insured vessel and any fixed or floating object or property of whatsoever nature, and including third party bodily injury liability as a result of breakaway from the permanent mooring location." In part B it provided: "This insurance covers costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law; . . ." That section contained one warranty: "Warranted full premium earned if vessel declared a total and/or constructive total loss and/or if the above mentioned limit of liability is exhausted." The owner of the vessel was listed in the policy as the Cotton Blossom Corp., Inc., the entity created by the Wilmerings to own and operate the Cotton Blossom restaurant.

1. "Touching the adventures and perils which we the said underwriters are content to bear and take upon us, they are of the seas, harbors, inland water, men-of-war, fire, lightning, earthquake, enemies, pirates, rovers, assailing thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, arrests, restraints and detainments of all kings, princes and peoples, of what nation, condition or quality soever, barratry of the master and mariners and of all other like perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said vessel and/or any part thereof, excepting, however, such of the foregoing perils as may be excluded by provi-

sions elsewhere in the policy or by endorsement . . ."

2. "Warranted vessel permanently moored at 200 South Wharf Street, St. Louis, Missouri and all government regulations complied with.
 "Warranted the vessel shall at all times be in the charge of a competent watchman
 "Excluding: Loss of use or occupancy or consequential loss of use or occupancy or consequential loss of any nature howsoever caused.
 "Warranted full premium earned if vessel declared a total and/or constructive total loss."

In the morning of January 24, 1978, the Cotton Blossom, moored on the riverfront, was noted to be listing 5° or more to starboard. Within thirty minutes she sank. No one was known to have been aboard since approximately 6:00 p.m. the previous evening. Normally Jere Wilmering, Jr., seventeen years old, was on board throughout the night when the vessel was otherwise unoccupied. Two guard dogs were kept aboard the vessel and were aboard on the night of January 23–24. On this occasion Wilmering, Jr. and his mother had gone to the Lake of the Ozarks for a few days while the Cotton Blossom was closed down due to winter weather conditions requiring the closing of the riverfront to visitors. When Wilmering, Jr. was not available Stoehner Security was hired to furnish watchman service. There was a dispute in the testimony concerning the reasons why Stoehner Security did not provide a watchman on that night. Stoehner contended that it was because they had not been paid for previous watchman service and that Wilmering, Sr. was advised that no service would be provided in the absence of payment of the arrearage. Plaintiffs denied that they were informed of the termination of service although admitting the arrearages. In view of the absence of an appeal from the directed verdict for Stoehner we need not deal with this dispute.[3]

The evidence did not establish concretely what caused the Cotton Blossom to sink other than that it filled up with water. The cause of any leak was not determined although some expert testimony was ad-

duced eliciting opinion of the cause. The evidence established the vessel sank in a sheltered berth in calm weather. There was also evidence which might support an inference of vandalism.

## PLAINTIFFS' APPEAL

On their appeal plaintiffs raise three allegations of error. Two will not arise on retrial so need not be further considered. The operative point relates to defendant's converse instructions to plaintiffs' verdict directors. The trial court properly treated the two sections of the policy—hull and contents and liability and wreck removal—as providing separate and distinct coverages. The court also properly held that the watchman warranty found only in Section I—hull and contents—did not apply to Section II—wreck removal—which contained no reference to such warranty. The failure of Section II to include such warranty is strong indication that it did not apply to that Section and is made conclusive when it is noted that both Sections explicitly contain a warranty that "full premium earned if vessel declared a total and/or constructive total loss ..." This establishes the intention of Lexington, the policy's author, that the warranties applicable to each section be separately recited in each section.

The trial court submitted each section to the jury in a separate package of instructions. Plaintiffs' verdict director under Section I hypothesized that Lexington "issued its policy ... covering loss to the hull and contents ... due to *the perils* of inland

3. Much of the evidence at trial dealt with the ability of a watchman to have averted the sinking had one been present. Normally in marine policies warranties are strictly enforced and breach therefore voids the policy regardless of materiality. *Shamrock Towing Co. v. American Ins. Co.*, 9 F.2d 57 (2 Cir.1925); *Aetna Ins. Co. v. Houston Oil and Transport Co.*, 49 F.2d 121 (5 Cir.1931). In Missouri Secs. 379.165, 379.170, and 379.175, RSMo.1978, provide that in policies for insurance against loss by fire, tornado, or cyclone, warranties not material to the risk insured against are held to be representations only. In *Wilburn Boat Company v. Fireman's Fund Insurance Company*, 348 U.S. 310, 75 S.Ct.

368, 99 L.Ed. 337 (1955) the Supreme Court held that warranty provisions of marine policies were subject to state regulation, particularly where the property insured, as here, remains solely or almost solely within one state. (Frankfurter concurring). On retrial the parties and trial court should be aware that to the extent "materiality to the risk insured against" is an issue, it is not equivalent to proximate cause. The absence of such materiality is not established by evidence that non-compliance with the warranty did not cause the loss.

water, and ... the 'Cotton Blossom' was damaged by *the perils* of inland water ..." Lexington's converse to this instruction was to find for Lexington "unless you believe the Cotton Blossom sank as a result of *a peril* of the inland water which was covered under the insurance policy ..." Plaintiffs' verdict director on Section II hypothesized that Lexington agreed to cover expenses of removal of the wreck and failed to do so. It did not refer to the perils of inland water. Lexington's converse to that instruction was identical to that used to converse the Section I verdict director. We deal with these two submissions in inverse order.

Lexington admits that the converse under Section II does not utilize "substantially" the same language as the verdict director as required by MAI 33.01 (1980 Revision) p. 487. It contends, however, that no error thereby occurred because plaintiffs improperly omitted the perils language from the verdict director and may not object that the converse required the jury to find that the wreck was caused by a peril of the inland waters. We disagree.

We note at the outset that Section II deals with two interrelated subjects-matter: liability to third persons and wreck removal where required by law. Both encompass losses sustained by the insured for liabilities incurred to third parties or enforceable by third parties. The need for such coverage to be distinctly articulated arose from two cases—*DeVaux v. Salvador,* 4 Ad. & E. 420, 111 Eng.Rep. 845 (K.B.1836) and *General Mutual Insurance Company v. Sherwood,* 55 U.S. (14 How.) 351, 14 L.Ed. 452 (1852). In both of those cases the courts held that damages to third persons incurred by a ship owner as a result of a collision were not the result of a "peril of the sea..." because the liability arose not from the collision but by operation of law

which the courts concluded was not a sea peril.[4] As a result of those cases the Collision clause or Running Down clause was added to marine policies. Hecht, The Hull Policy: Interrelationship of Hull and P & I, 41 Tulane Law Review 389; Eastham, The Hull Policy: The Running Down Clause etc., 41 Tulane Law Review 399. Its addition was necessary because the liability incurred was not as a matter of law caused by "perils of the sea" and was not covered by the "perils" language. The wreck removal provision has a similar purpose. *See* 33 U.S.C. § 401 et seq.

■ The coverage is, under the policy before us, triggered only when the removal of the wreck is "compulsory by law." The ordinances of the City of St. Louis, pursuant to statutory grant (Sec. 68.025, RSMo. 1978), require removal of wrecks from the river at the expense of the owner. From the described history we conclude that the wreck removal provision was not contingent upon the wreck being caused by "perils of the inland waters." This conclusion is buttressed by the policy itself. The Hull and Contents portion of the policy makes specific reference to the "perils insured against under this policy." No reference to "perils" is contained in the collision liability and wreck removal section. That section provides for payment when certain situations occur without qualification of the cause of those situations. The converse instruction not only was contrary to MAI 33.01 but constituted a positive misdirection. Its submission was reversible error.

We turn to the Section I submission. Some review of the law of marine insurance is required. Counsel have not provided us with authority in this area, preferring to rely instead on Missouri cases which address the instruction process generally. We do not find ourselves able to resolve the matter without first determining the

**4.** In the *Sherwood* case the court distinguished *Peters v. Warren Ins. Co.,* 39 U.S. (14 Pet.) 99, 10 L.Ed. 371 (1840) where the liability arose without fault pursuant to the marine law of Hamburg. The *Peters* case was clearly contrary to *DeVaux v. Salvador, supra,* and the distinction drawn in *Sherwood* appears tenuous at best.

basis of recovery provided under the policy before us. We embark on this uncharted voyage with the realization that we are touching the adventures and perils of the law of the sea which the undersigned writer is content to bear and take on. We have made brief reference to the "quaint" language of the perils clause. However, its usage in virtually identical form for four centuries has provided a fairly stable body of law, at times arbitrary but nonetheless reasonably consistent. As we view the verdict director and converse we note that the difference between them is the general requirement in the verdict director that the loss was occasioned by "perils" of the inland water and the specific requirement of the converse that "a peril" be found. If this difference of phraseology constitutes a substantive difference in the plaintiffs' legal right to recover then the utilization of the differing language in the converse is error. We find there is a substantive difference.

■■■ The burden is of course upon plaintiffs to establish that the loss sustained is one covered by the policy. *Chasse v. Newark Insurance Company*, 282 A.2d 194 (R.I.1971) [2]; *Darien Bank v. Travelers Indem. Co.*, 654 F.2d 1015 (5 Cir.1981) [1]. There is in every policy of marine insurance either expressly or by implication a warranty of seaworthiness. *Texaco Inc. v. Universal Marine, Inc.*, 1976 A.M.C. 226 (D.C.La.1975), l.c. 242. Seaworthiness is determined by the use to which the vessel is to be placed and the place of its use. *Klein v. Globe & Rutgers Fire Ins. Co.*, 2 F.2d 137 (3 Cir.1924) [3]. The question of seaworthiness here is whether the Cotton Blossom was fit for use as a permanently moored floating restaurant on the Mississippi riverfront. It is established that if a vessel sinks at a sheltered berth in calm weather without any obvious explanation, a presumption arises that the incursion of water which caused the sinking, and hence the loss, was due to the unseaworthiness of the vessel. *Boston Ins. Co. v. Dehydrat-*

*ing Process Co.*, 204 F.2d 441 (1 Cir.1953) [1, 2]. However, as stated by that court:

"But it appears to be equally well settled, and the parties also agree, that an insured can rebut the foregoing presumption by establishing that in fact the vessel concerned was seaworthy before the sinking, and was neither overloaded nor improperly loaded, and if he succeeds in doing so, *the counter-presumption arises that the unexplained sinking and consequent loss was caused by some extraordinary, although unknown and unascertainable, peril of the sea.*" (Emphasis supplied).

*See also, Paddock-Hawley Iron Co. v. Providence-Washington Ins. Co. of Providence, R.I.*, 118 Mo.App. 85, 93 S.W. 358 (1906); *Land v. Franklin Nat. Ins. Co. of New York*, 80 S.E.2d 420 (S.C.1954) [4, 5]. In the *Paddock-Hawley Iron Co.* case, *supra*, it was stated:

"If the barge was seaworthy when the policy was issued ... it seems to us that the reasonable presumption is that it remained seaworthy until the time it sank; there being no evidence to the contrary." l.c. 362.

This is the accepted law as it relates to time policies (vis-a-vis voyage for voyage policies) in marine insurance. *Saskatchewan Government Ins. Office v. Spot Pack*, 242 F.2d 385 (5 Cir.1957) [2]; *Tropical Marine Products Inc. v. Birmingham Fire Insurance Company of Pennsylvania*, 247 F.2d 116 (5 Cir.1957).

■■■ The plaintiffs here provided evidence that shortly prior to issuance of the policy the Cotton Blossom was seaworthy for use as a floating restaurant. The Stewart survey is evidence of that fact. The evidence further allowed the conclusion that no subsequent change occurred in that condition. Plaintiffs' evidence if believed by the jury was sufficient to trigger the counter-presumption that the loss occurred from an unknown peril of the inland water. There was no evidence here from which a

specific peril could be identified. The evidence leaves the possibility that the loss could have occurred from any of several possibilities or from some unknown cause fortuitously occurring. It is not necessary that plaintiffs identify a specific peril in order to recover. *Boston Ins. Co. v. Dehydrating Process Co., supra,* [4]; *Darien Bank v. Travelers Indem. Co., supra,* [4]; *Land v. Franklin Nat. Ins. Co. of New York, supra,* [3]. As stated in *Paddock-Hawley Iron Co. v. Providence-Washington Ins. Co., supra,* l.c. 362:

> "... in the absence of any evidence of any cause for its loss, the presumption is that the loss was occasioned by a peril of the river, and there is no more reason for requiring the plaintiff to prove the exact peril which caused the loss than there would be to require a plaintiff in a suit on a policy insuring his dwelling house against loss by fire to prove the exact origin of the fire."

■ It has also been held that the unintentional incursion of water into a vessel is a peril covered by the policy. *New York, New Haven and Hartford Railway Company v. Gray,* 240 F.2d 460 (2 Cir.1957); *Cohen, Sons, and Co. v. National Benefit Assurance Company, Limited,* 40 Times L. 347 (K.B.1924).

■ The language utilized in the converse could have led a jury to believe that unless it could find a single specific peril which caused the Cotton Blossom to sink it must find for Lexington. As we have set forth it is not necessary that a specific peril or even a single peril be found to allow recovery under the policy.[5] The variation in the converse from the language of the verdict director was erroneous. We are cognizant that in *Fowler v. Park Corporation,* 673 S.W.2d 749 (Mo.1984) the court found no prejudicial error in a one word deviation from the prescribed MAI instruc-

tion. That case involved a definition instruction. Utilizing the case-by-case approach prescribed by *Fowler* in evaluating instructional error we conclude here that the variation, though minor in form, was major in substance and therefore prejudicial.

Neither party has raised as a point relied upon any claim of error in the failure of the trial court to sustain their respective motions for directed verdict. We therefore do not address that question.

## LAWTON–BYRNE–BRUNER'S APPEAL

In their petition against Lawton-Byrne-Bruner plaintiffs alleged that the brokers failed to obtain the insurance requested of them and failed to adequately explain the policy obtained to plaintiffs. The plaintiffs submitted to the jury only the contention that Lawton-Byrne-Bruner was negligent in failing to advise plaintiffs "of the risks of inclusion of the 'watchman' clause in the policy." They have therefore abandoned any claim against the broker for failure to obtain the insurance requested. *Stroh v. Johns,* 264 S.W.2d 304 (Mo.1954) [1].

■ The duty of an insurance broker has been set forth in several cases in this state. *Zeff Distributing Company v. Aetna Casualty and Surety Company,* 389 S.W.2d 789 (Mo.1965) [3–6]; *Hlavaty v. Kribs Ford, Inc.,* 622 S.W.2d 328 (Mo.App.1981) [1]; *Pittman v. Great American Life Insurance Company,* 512 S.W.2d 857 (Mo. App.1974) [3–5]; *Hall v. Charlton,* 447 S.W.2d 5 (Mo.App.1969) [2]; *Kap-pel Fabrics, Inc. v. R.B. Jones & Sons, Inc.,* 402 S.W.2d 49 (Mo.App.1966) [3]. As stated in *Pittman v. Great American Life Insurance Company, supra,* that duty is as follows:

> "When an insurance agent undertakes to procure insurance for a party, with a view to earning a commission, he be-

---

**5.** In view of the presumption and counter-presumption and the fact that issuance of the policy was admitted, the only fact which really needed to be submitted for jury decision in plaintiffs' verdict director was the seaworthiness of the vessel.

comes the party's agent and owes a duty to the party to act with reasonable care, skill and diligence ... If the agent is unable to effectuate the insurance he has a duty to timely so notify his client ... Failure of an agent to so notify his client will render the agent liable to the client for damages and the client, at his election, may sue the agent either for breach of contract or in tort for negligent breach of the agent's duty to timely notify the client that the requested insurance was not obtained."

■ The broker here performed its duty of bringing the insurance company and the insured together in a contract of insurance as requested by the insured. That contract was in writing, was delivered to the insured, and was read by the principal officer of the insured. We have been cited to no case, and have found none, which imposes upon the broker a further duty to explain the policy to the insured. The cases which have dealt with such a duty have all found no such duty to exist. *Fries-Breslin Co. v. Bergen*, 176 F. 76 (3 Cir.1909) l.c. 79; *Cox v. Santoro*, 98 N.J.Super. 360, 237 A.2d 491 (1967) [2–4]; *Barnes v. Metropolitan Life Insurance Co.*, 612 S.W.2d 786 (Mo.App. 1981) [1–3]. This is particularly true where, as here, no request for such advice was made. The insured has an obligation to advise himself of his purchase and while that obligation is less exacting as to insured's own representative and broker that "does not mean that an insured can close his eyes and go on forever and act as an incompetent ward with the broker as his guaranteeing guardian." *Kap-pel Fabrics, Inc. v. R.B. Jones & Sons, Inc., supra*, [9]. The "watchman" warranty is prominently displayed in the policy which was read by Jere Wilmering, Sr. It was in accord with the representations made by the insured in its application for the insurance that someone would be aboard at all times. We find no duty of Lawton-Byrne-Bruner to explain the "watchman" warranty and the judgment against it must be reversed.

Motion taken with the case is denied.

Judgment in favor of Lexington Insurance Company and against plaintiffs on Counts I and II is reversed and remanded for new trial. Judgment against Lawton-Byrne-Bruner and in favor of plaintiffs as statutory trustees and individually is reversed.

GAERTNER, P.J., and STEPHAN, J., concur.